Thomas G. KOCH, Plaintiff-Appellant,

v.

CITY OF HUTCHINSON, et al.,
Defendants-Appellees.

No. 83-2561.

United States Court of Appeals,
Tenth Circuit.

June 2, 1988.

Margie J. Phelps (Fred W. Phelps, Jr., with her on the briefs), Phelps-Chartered, Topeka, Kan., for plaintiff-appellant.

Robert L. Howard, Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan. (Timothy B. Mustaine, Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., and Philip H. Alexander, City Atty., Hutchinson, Kan., with him on the briefs), for defendants-appellees.

James M. Kaup, Gen. Counsel, League of Kansas Municipalities, Topeka, Kan., amicus curiae.

Before HOLLOWAY, Chief Judge, and McKAY, LOGAN, SEYMOUR, MOORE, ANDERSON, TACHA and BALDOCK, Circuit Judges.

## ON REHEARING EN BANC

STEPHEN H. ANDERSON, Circuit Judge.

Plaintiff/appellant Thomas Koch was demoted from Fire Marshal for the City of Hutchinson (the "City") in part because of a written report he prepared in the course of his official duties in which he stated his professional opinion as to the cause of a fire. He contends that the report was protected speech under the First Amendment and could not therefore be the basis for his demotion. After a jury verdict in Koch's favor, the United States District Court for the District of Kansas granted the City's motion for judgment notwithstanding the verdict, set aside the jury's verdict and entered judgment for the City. A panel of this court reversed the district court's judgment. We granted rehearing en banc and, after further consideration, we affirm the district court's judgment for the City.

## BACKGROUND

Koch served as Fire Marshal for the City from November 1976 until he was demoted to Fire Prevention Inspector on July 23, 1979. Koch worked under the supervision of the Fire Chief of the Hutchinson Fire Department, defendant Dallas Jones. His duties as Fire Marshal included the investi-

gation of all fires within the City and the supervision of subordinate fire inspectors.[1]

On May 11, 1979, in pursuit of their official duties, Koch and two subordinate fire inspectors investigated a house fire in which an unattended small child died. In the course of his investigation, Koch sent various items to General Laboratories, an independent laboratory, for analysis. In its report to Koch dated May 22, 1979, the laboratory concluded that a cracked gas valve was a possible source of the fire. Although he had earlier expressed the view that the fire was accidental, Koch stated in his May 24 official report to Reno County Attorney Joseph O'Sullivan that the fire "was an aggravated arson fire." The report did not mention the analysis of the cracked gas valve by General Laboratories.[2]

O'Sullivan, whose responsibility it was to determine if criminal prosecution was warranted in connection with a fire, questioned Koch's May 24 report and conclusions and, the day after he received it, asked the other two fire investigators to submit written statements on the cause of the fire.[3] Both investigators reported the fire as accidental. O'Sullivan also had asked a Kansas Bureau of Investigation ("K.B.I.") agent to investigate and report on the fire. The K.B.I. agent also determined that there was no basis for concluding that the fire resulted from arson. The agent testified that Koch "did not like us questioning his abilities" in the investigation and provided little information on his conclusion that ar-

---

1. In addition to the City and Jones, the remaining defendants were Joan Schrag, Bill Bornholdt, Ralph Gingerich, John Corey, Dan Robinson and George Pyle. Schrag was the mayor, Pyle was the City Manager, and the others were City Commissioners of Hutchinson at the time of Koch's demotion.

2. There was testimony suggesting that other pieces of information should have been included in Koch's report. R. Vol. XV at 1477–78; R. Vol. XVII at 1799–1800. On cross-examination, the City elicited from Koch that certain other "details" of which Koch was aware (the fact that an electrical inspector determined that the house had oversized fuses and poor wiring and the fact that Koch's two subordinate fire inspec-

tors believed the fire to be of accidental origin) were omitted from the report. R. Vol. XV at 1425–30.

3. O'Sullivan testified he was suspicious about Koch's report because Koch's views in the report differed from those of the other inspectors and because O'Sullivan felt "that Mr. Koch had changed his mind regarding the cause of the fire after he found out the parents [of the dead child] couldn't be charged with endangering a child." R. Vol. XVI at 1573. The subordinate inspectors testified, and had earlier reported to a police detective who investigated Koch, that they viewed Koch's change in view in the same way. R. Vol. XIV at 927–28, 1030–35; R. Vol. XIX, Pl.'s Ex. 52 at 80.

son caused the fire. R.Supp.Vol. XVIII at 66–67.

On May 25, in response to a request from a Hutchinson newspaper reporter, O'Sullivan released to the press the contents of Koch's report and the reports of the other investigators. On May 30, O'Sullivan, the K.B.I. agent, Koch, Fire Chief Jones, and a police detective met to discuss the situation. Although Koch testified at trial that he felt he cooperated with other officials and answered their questions, Jones, O'Sullivan and the K.B.I. agent testified that Koch was uncooperative and that Koch and O'Sullivan argued. O'Sullivan testified that, in discussing the laboratory analysis omitted from his report, Koch told him that the laboratory results were "negative" and that nothing in the laboratory report contradicted Koch's conclusion. R.Vol. XVI at 1577. Soon thereafter, a local newspaper story chronicled the dispute as to the origin of the fire.

Sometime after June 5, after learning of the actual contents of the laboratory analysis, O'Sullivan requested a police investigation of Koch because he believed Koch's omission of that analysis from his report amounted to official misconduct. The investigating detective reported that Koch became "upset" and "irrate" [sic] during the investigation, and that he "told me that he did not have to explain or defend his report to anyone." R.Vol. XIX, Pl.'s Ex. 52 at 81.[4] After receiving the police report, O'Sullivan wrote Jones on July 13, stating that:

> The net result is a total lack of confidence in his [Koch's] opinion and in his ability to rationally and professionally conduct an investigation. This lack of confidence is not only on my part but is shared with me by the police detectives and the local K.B.I. agent. On the other hand and to the contrary we have total confidence in the other arson investiga-

tors in your department, and that not only are they pleasant and cooperative to work with but their conclusions appear based in fact and reason. On behalf of the Reno County Attorney's Office and as long as I hold this position, I will not accept a report from Chief Fire Marshall [sic] Thomas Koch as the basis of a criminal charge nor do I feel that I could ever call him as a State's witness and sponsor him as credible and reliable.

R.Supp.Vol. XIX, Pl.'s Ex. 10.

After receiving O'Sullivan's letter, Jones met with City Manager Pyle to discuss the situation and they determined to put Koch on paid leave of absence until the matter could be investigated. Jones conducted an investigation, during which he met with Koch and heard Koch's view of the situation. After completing the investigation, Jones and Pyle decided to demote Koch and he was so notified on July 23 in a letter in which Jones stated that Koch had been "uncooperative and belligerent with representatives of other investigating agencies," had not disclosed information "very important and relevant to the investigation," had by his behavior and refusal to cooperate with other investigators "destroyed necessary working relationships with these agencies," and had failed to cooperate with O'Sullivan. R.Vol. XIX Pl.'s Ex. 2. After Koch's demotion and suspension, local newspaper stories described the entire situation.

Koch subsequently filed this action in the United States District Court for the District of Kansas, alleging that his demotion violated his First, Fifth, Ninth, and Fourteenth Amendment rights and 42 U.S.C. §§ 1983, 1985, 1986 and 1988. The district court disposed of all claims against the City Commissioners, the procedural due process claims, and the conspiracy claims in various pretrial rulings and in a partial directed verdict.[5] The district court denied defend-

---

4. The detective's testimony was that Koch got "quite irritated" and "agitated" and "told me that he didn't have to explain his report to me or any other policeman, and we had a few words and he left the office." R. Vol. XVI at 1781.

5. Koch had earlier filed a state court mandamus action, which resulted in findings against him on all counts, including a due process claim. *Koch v. Martindell*, No. 79 C 403 (Kan.Dist.Ct. Aug. 28, 1980). The Kansas Court of Appeals affirmed in a per curiam opinion, *Koch v. Martindell*, No. 80–52, 577–A (Kan.Ct.App. Nov. 5,

ants' motion for a directed verdict on the First Amendment claim and instructed the jury that Koch's conclusion in his report that the fire was caused by aggravated arson was protected speech as a matter of law, so the City was prohibited from demoting Koch on the basis of that written conclusion. By special verdict the jury found the City liable on Koch's First Amendment claim and assessed damages of $100,000. It found defendants Pyle and Jones not liable and found that the actions of Pyle and Jones in demoting Koch were "reasonable and in good faith under all of the circumstances then existing."

The City thereafter moved for judgment n.o.v., arguing that, as a matter of law, Koch's speech was unprotected under the First Amendment because it was not on a matter of "public concern" within the meaning of *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), because it failed the balancing test of *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and because there was insufficient evidence that Koch's speech, if protected, was the substantial or motivating factor in his demotion. The district court granted the City's motion for judgment n.o.v., holding that Koch's speech was unprotected because it was an "intragovernmental communication within the scope of plaintiff's

official duties" and because it did not address matters of public concern.

A divided panel of this court reversed the judgment n.o.v. and reinstated the jury's verdict, holding that the speech at issue in this case was constitutionally protected. It affirmed the district court's other rulings. We granted rehearing en banc on the issue of whether Koch's speech was constitutionally protected.[6]

For the reasons set forth below, we hold that Koch's speech was unprotected under the First Amendment and we therefore affirm the district court's entry of judgment for the City.

## DISCUSSION

Relying on *Schmidt v. Fremont County School District No. 25*, 558 F.2d 982 (10th Cir.1977), the City argues that Koch's speech was unprotected under a *per se* rule removing constitutional protection from "public employee speech that is a normal, integral part of the employee's job." Brief of Appellee City of Hutchinson Upon Rehearing En Banc at 15.[7] The City also argues that the speech at issue was not on a matter of public concern within the meaning of *Connick v. Meyers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), contesting the reasons provided by the panel majority opinion for finding the speech was on a matter of public concern.[8] Finally, the

1981) and Koch did not appeal that decision to the Kansas Supreme Court. Accordingly, the district court granted defendants' motion for partial summary judgment on the procedural due process claims on the basis of collateral estoppel. R. Vol. I at 120–23.

**6.** The previous panel opinion disposed of Koch's five other grounds for challenging the district court's judgment. *See Koch v. City of Hutchinson*, 814 F.2d 1489 (10th Cir.1987). We do not disturb the panel decision on those issues. We address only the question of whether Koch's written report was protected speech under the First and Fourteenth Amendments such that it was impermissible for the City to demote Koch on the basis of that speech.

We note that a recent Supreme Court decision, *St. Louis v. Praprotnik*, —— U.S. ——, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), has, in a plurality opinion, addressed the circumstances in which a municipality will be liable for section 1983 violations predicated upon an employment decision. The City in this case initially asserted

as a defense that its decision to demote Koch was "not based upon or in furtherance of any established municipal policy," R. Vol. I at 10–11, but it makes no argument on that issue before this court. In granting the City's motion for judgment n.o.v., the district court stated:

The court has not been asked to decide, nor does it decide, for the purposes of defendant's motion, whether the acts of the individual defendants constituted official policy or custom of the City of Hutchinson so as to subject the City to liability under 42 U.S.C. § 1983. R. Vol. I at 367. In view of our disposition of this case, we need not address that question.

**7.** Both the district court and Judge Seth in his dissent from the panel opinion in this case relied in part on *Schmidt* to find Koch's speech unprotected.

**8.** The panel opinion based its conclusion that Koch's speech was on a matter of public concern on the fact that Koch's report was ultimately disclosed to the press, that Kansas law pro-

City argues that, even if Koch's speech were on a matter of public concern and were not unprotected under the *Schmidt* *per se* rule, the *Pickering* balancing test mandates that the speech be unprotected.

Koch argues that *Schmidt* has been implicitly overruled by *Connick* and can therefore no longer serve as the basis for disposition of this case. He further argues that the applicability of the *Pickering* balancing test is not properly before the court because the district court never relied on it in granting judgment n.o.v. to the City, and therefore, impliedly ruled in Koch's favor on that issue. He further contends that the City may not appeal that implicit decision because it failed to file a cross-appeal. Accordingly, Koch argues, the only issue in this appeal is whether Koch's speech was on a matter of public concern.[9]

It is well settled that "a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983)(citations omitted); *see also Rankin v. McPherson*, — U.S. —, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). Nonetheless, a state, as an employer, has compelling interests of its own. Courts must strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968).

The three United States Supreme Court cases just cited establish the basic framework for analyzing a claim by a public employee that his or her governmental employer made an adverse employment decision in violation of the employee's First Amendment rights. The balancing test set out in *Pickering* provides the touchstone. In *Rankin* the Supreme Court reaffirmed its holding in *Connick* that the "threshold question in applying this balancing test is whether [the employee's] speech may be 'fairly characterized as constituting speech on a matter of public concern.'" *Rankin*, 107 S.Ct. at 2896–97 (quoting *Connick*, 461 U.S. at 146, 103 S.Ct. at 1690).[10] The public concern inquiry turns on the content, form, and context of the speech in question, as revealed by the whole record. *Id.* at 2897. If a statement does touch on a matter of public concern, a court must then balance the interests of the employee in making the statement against the state's interest as an employer "in promoting the efficiency of the public services it performs through its employees." *Id.* at 2898 (quoting *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1735).[11]

vides the public with access to Fire Marshal investigative reports, and that "Koch's objective was to inform his superiors of what he believed to be arson and then the public of what he believed was defendants' misfeasance." *Koch*, 814 F.2d at 1498.

9. Koch further argues that, even if the *Pickering* balancing test is properly before the court, application of the test would result in a finding that his speech was protected.

10. *Rankin* also reaffirmed that even public employee speech not involving matters of public concern may, in "unusual circumstances," be protected by the First Amendment. *Rankin*, 107 S.Ct. at 2897 n. 7. The Court has not elaborated on what such "unusual circumstances" might be and, in any event, we find no "unusual circumstances" present in this case.

11. The complete inquiry into whether a state employer's personnel decision has improperly infringed upon an employee's First Amendment rights involves several steps. First, the employee must show that his speech was constitutionally protected (the *Connick–Pickering* test, a question of law); next, the employee must prove that his protected speech "was a 'motivating factor' in the detrimental employment decision. The employer 'then bears the burden of showing by a preponderance of the evidence that it would have reached the same decision ... in the absence of the protected activity.'" *Saye v. St. Vrain Valley School Dist. RE–1J*, 785 F.2d 862, 866 (10th Cir.1986) (quoting *Childers v. Independent School Dist.*, 676 F.2d 1338, 1341 (10th Cir.1982)); *see also American Postal Workers Union, AFL–CIO v. United States Postal Service*, 830 F.2d 294, 310–11 (D.C.Cir.1987); *Wren v. Spurlock*, 798 F.2d 1313, 1317 (10th Cir.1986) *cert. denied*, — U.S. —, 107 S.Ct. 1287, 94 L.Ed.2d 145 (1987); *Brasslett v. Cota*, 761 F.2d 827, 839 (1st Cir.1985); *Czurlanis v. Albanese*, 721 F.2d 98, 103 (3d Cir.1983). These latter two steps are factual questions, *Wren*, 798 F.2d at 1317, which the jury, in this case, resolved in Koch's favor. Our disposition of this case

## A. Standard of Review.

As a preliminary matter, we delineate the applicable standard of review for an appellate court in a First Amendment case.[12] The Supreme Court has made very clear that "an appellate court has an obligation [in First Amendment cases] to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Rankin*, 107 S.Ct. at 2897 n. 9 (quoting *Bose Corp. v. Consumers Union of the United States, Inc.*, 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984)). The protected or unprotected nature of speech is ultimately a question of law. *Id.; Connick*, 461 U.S. at 148 n. 7, 150 n. 10, 103 S.Ct. at 1691 n. 7, 1692 n. 10; *Page v. Delaune*, 837 F.2d 233, 237 (5th Cir.1988) ("In determining whether an employee's speech addresses a matter of public concern, this Court considers the speech and its context and independently reviews the record as a whole. The issue is a question of law for the court.") (citations omitted); *Piver v. Pender County Bd. of Educ.*, 835 F.2d 1076, 1081–82 (4th Cir. 1987) ("The district court never considered or passed upon the second prong of the *Pickering–Connick* inquiry—the 'balancing' inquiry. We have addressed it, however, because it is a question of law and we are persuaded that the record below is sufficient to enable us to do so correctly."); *Wren v. Spurlock*, 798 F.2d 1313, 1318 (10th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1287, 94 L.Ed.2d 145 (1987) ("the trial court erred in leaving that balance [under *Pickering*] to the jury, rather than ruling on it as a matter of law.").[13] Consistent with that clear mandate, we proceed to our own independent review of the record to determine whether Koch's speech was protected.[14]

## B. Existence of Per Se Rule for Speech in Course of Official Duties.

As indicated, our task is first to determine whether Koch's speech touched upon a matter of public concern. If we find that it did, we must then conduct the balancing of employer and employee interests required by *Pickering*. An initial question, however, is whether Koch's speech is exempted from First Amendment protection because of a *per se* rule removing First

makes it unnecessary to address the jury's verdict on the second and third steps.

**12.** The majority of the previous panel specifically declined to address the question of whether the district court's grant of judgment n.o.v. to the City could be upheld under the balancing test enunciated in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), on the ground that the jury had resolved that balancing and the jury's resolution was not at issue on appeal. We now clarify the standard of review appropriate to both the public concern and the *Pickering* balancing aspects of a First Amendment claim.

**13.** *See also Brasslett v. Cota*, 761 F.2d 827, 839–40 (1st Cir.1985); *Jurgensen v. Fairfax County*, 745 F.2d 868, 881 n. 20 (4th Cir.1984) (court stated that it would be contrary to *Connick* and its own previous decision in *Jones v. Dodson*, 727 F.2d 1329 (4th Cir.1984) to submit the resolution of the *Pickering* balancing question to the jury); *Czurlanis v. Albanese*, 721 F.2d 98, 105 (3d Cir.1983) ("[I]t is the role of the court in a case alleging retaliatory action which violates the First Amendment to decide not only whether the speech at issue related to a matter of public concern, but also to conduct the necessary

*Pickering* balancing."); *Waters v. Chaffin*, 684 F.2d 833, 837 n. 10 (11th Cir.1982) ("Determining whether an employee's speech or conduct is constitutionally protected is a question of law, so we are not bound by the district court's application of the *Pickering* test to this case.").

**14.** We reject Koch's argument that the *Pickering* balancing test is not properly before this court because the district court did not rely on that test in granting judgment n.o.v. to the City, thereby implicitly ruling in Koch's favor on that issue, and because the City failed to cross-appeal the district court's implicit decision. As indicated, application of the *Pickering* balancing test is a question of law, properly reviewable de novo by this court. The failure of the City to cross-appeal that point does not render it unreviewable by this court. *See Blum v. Bacon*, 457 U.S. 132, 102 S.Ct. 2355, 72 L.Ed.2d 728 (1982); *Mass. Mutual Life Ins. Co. v. Ludwig*, 426 U.S. 479, 96 S.Ct. 2158, 48 L.Ed.2d 784 (1976) (per curiam); *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429 (7th Cir.1987), *cert. dismissed,* —— U.S. ——, 108 S.Ct. 1067 99 L.Ed.2d 229 (1988); *see also Scivally v. Time Ins. Co.*, 724 F.2d 101, 103 (10th Cir.1983) ("trial court's decision will be affirmed if the record reveals another ground which supports the decision").

Amendment protection from speech occuring in the course of an employee's official duties.

■ The City argues that communications made in the course of an employee's official duties are *per se* exempted from First Amendment protection. We hold that they are not. The City's argument relies primarily on *Schmidt v. Fremont County School District*, 558 F.2d 982 (10th Cir. 1977), a previous decision of this circuit on which both the district court and the dissent to the previous panel opinion in this case relied to find Koch's speech unprotected. In *Schmidt*, this court affirmed a district court decision that statements by a high school principal to the board of education concerning the school's career education program and football reserved ticket sales policy were "not on issues of general public concern but statements at the school on the internal affairs of the school system." *Id.* at 984. This court went on to say, "[the statements] were part of his official functions. These statements do not invoke First Amendment protection." *Id.* at 985.

Koch argues that *Schmidt* has been "obviously superseded and modified by *Connick*" and is "out-dated." Supplemental Brief of Appellant at 24, 26. Koch argues that no "official function" exception to First Amendment protection survives *Connick;* now, the only inquiry, at the threshold level, is whether the speech in question touches upon a matter of public concern. We find no reason to conclude that *Schmidt* has been either implicitly or explicitly overruled by *Connick.* Nonetheless, we do not view it as establishing a *per se* rule exempting statements made in the course of official duties from the protection of the First Amendment.

The Supreme Court in *Givhan v. Western Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) established that private expression taking place on the jobsite can be protected under the First Amendment. Nonetheless, the Court has not specifically addressed the issue of whether speech in the course of and as a part of an employee's ordinary duties is or is not *per se* protected. In *Wilson v. City of Littleton*, 732 F.2d 765, 767 (10th Cir.1984), this court cited *Schmidt* for the proposition that "[t]his circuit has applied the *Pickering* test to review various forms of allegedly unconstitutional discipline against public employees." We did not suggest that *Schmidt* had been overruled; rather the decision was viewed as yet another application of *Pickering's* balancing test. The Supreme Court in *Connick* cited *Schmidt* for the proposition that "if ... [an employee's speech] cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for ... [the employee's] discharge." *Connick*, 461 U.S. at 146 & n. 6, 103 S.Ct. at 1690 & n. 6. We see no evidence of either the Tenth Circuit's or the Supreme Court's dissatisfaction with *Schmidt.* We view *Schmidt* as simply holding that, in that particular case, the speech in question was unprotected under the First Amendment, and the fact that the employee statements were made as a part of the employee's official functions was only one of the relevant factors in the decision. *See also Marcum v. Dahl*, 658 F.2d 731, 734 (10th Cir.1981) (court cited *Schmidt* for the proposition that "problems created by the controversy between the scholarship and non-scholarship players were internal problems with which defendants [athletic directors at university] were required to deal in their official capacities. Such matters are not of general public concern.") The fact that the speech at issue occurred during or as a part of an employee's official duties is but one consideration in the *Connick–Pickering* inquiry. Nonetheless, it is a *significant* factor which may frequently lead to a finding that speech is unprotected, because, as we discuss more fully *infra* when we conduct the *Pickering* balancing in this case, speech in the course of an employee's duties will usually, if not always, reflect upon the employee's competence to perform his or her job.

Two recent cases from other circuits are instructive. In *Gomez v. Texas Dept. of Mental Health and Mental Retardation*, 794 F.2d 1018 (5th Cir.1986), the court

found that comments by an employee of a state treatment facility for the mentally ill did not address matters of public concern. The state employee's duties in *Gomez* included coordinating the transfer of patients from the state center to a county center providing similar treatment. The comments were directed to an employee of the county center and concerned the length of time patients stayed at the state center prior to transfer to the county center. In conducting the public concern inquiry, the court noted that the statement "took place in the course of a routine meeting whose purpose was to coordinate the transfer of patients from one government facility to another, [and] was made to an employee of the County Center responsible for some of the transferred patients." *Id.* at 1021. Similarly, in *Egger v. Phillips*, 710 F.2d 292, 315 (7th Cir.), *cert. denied*, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983), the court stated that, "given that [the employee] was in a very real sense performing his official function as an FBI agent in investigating and reporting his suspicions about ... [a co-employee] ... to his superior, the question of whether [the employee] was speaking as a concerned citizen and whether his speech touched on a matter of public concern invoking First Amendment protection would have been in doubt to a reasonable person in light of contemporaneous authority." [15] Thus, courts which have addressed the issue have declined to establish a *per se* rule exempting speech made in the course of an employee's official duties, but have viewed that fact as militating against a finding that the speech addressed matters of public concern. Similarly, it is a significant factor in the balancing required under *Pickering*.

### C. *Whether Koch's Speech Was On a Matter of Public Concern.*

The district court granted the City's motion for judgment n.o.v. because it held

that Koch's speech did not involve a matter of public concern within the meaning of *Connick*. We agree.

As indicated, we must consider the content, form and context of the speech in question to determine whether it relates to a matter of public concern. While cautioning that it is neither "appropriate [n]or feasible to attempt to lay down a general standard against which all [public employee] statements may be judged," *Pickering*, 391 U.S. at 569, 88 S.Ct. at 1735, the Supreme Court has broadly defined "public concern" as follows: "[W]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary." *Connick*, 461 U.S. at 146, 103 S.Ct. at 1690. The Court in *Connick* contrasted speech "as a citizen upon matters of public concern" with speech "as an employee upon matters only of personal interest." *Id.* at 147, 103 S.Ct. at 1690.

The facts of *Connick* illustrate the content, form and context inquiry. In *Connick*, the plaintiff-employee, Myers, was an assistant district attorney, who, upon learning of her impending transfer to a different section of the criminal court, expressed dissatisfaction concerning that transfer to her superiors, including Connick, the District Attorney. She met with one of her superiors and discussed her transfer as well as various other office matters. After being told that her concerns were not shared by others in the office, Myers prepared a questionnaire soliciting the views of her co-workers on "office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to

---

**15.** The court in *Egger* also impliedly rejected the rationale of *Schmidt* as establishing a *per se* content-based rule exempting "peculiarly internal matters of governmental employment" from First Amendment protection. *Egger*, 710 F.2d at 316. In so doing the court stated, "the courts which suggest otherwise in our view are merely *sub silentio* striking the *Pickering* balance in

cases which are probably too clear to require extended analysis." *Id.* While the decision in *Egger* was written prior to the Supreme Court's *Connick* decision, the court viewed *Connick* as providing "additional support for our decision in this case regarding the free speech issue." *Id.* at 294 n. *.

work on political campaigns." *Id.* at 141, 103 S.Ct. at 1687. She distributed the questionnaire during office hours the following day, which caused one of her superiors to inform Connick that Myers was creating a "mini-insurrection." Connick then fired Myers on the stated grounds that she refused to accept the transfer and her distribution of the questionnaire amounted to insubordination.

Myers brought suit under 42 U.S.C. § 1983, alleging that her employment was terminated in violation of her First Amendment rights. The Supreme Court ultimately disagreed, holding that Myers' questionnaire, except as it related to the question concerning pressure to work on political campaigns, did not touch upon matters of public concern. Rather, looking at the context of the speech, the Court viewed the bulk of the questions "as mere extensions of Myers' dispute over her transfer to another section of the criminal court." *Id.* at 148, 103 S.Ct. at 1691. With regard to the content of the speech, the Court rejected the argument that those questions "are of public import in evaluating the performance of the District Attorney as an elected official." *Id.* More specifically, the Court stated:

> Myers did not seek to inform the public that the District Attorney's Office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases. Nor did Myers seek to bring to light actual or potential wrongdoing or breach of public trust on the part of Connick or others.

*Id.* Thus, since the "focus" of her questionnaire was "to gather ammunition for another round of controversy with her superiors", no matters of public concern were implicated.[16] *Id.*

In contrast to *Connick*, in both *Pickering* and *Rankin* the Supreme Court found speech on matters of public concern. In *Pickering*, appellant Pickering, a high school teacher, wrote a letter to a local newspaper critical of the local school board's methods of informing taxpayers of the reasons why additional revenues for schools were needed. The letter also criticized the way the school board allocated money between educational and athletic programs. The letter was sent in the context of the school board's proposed tax increase to raise money for educational purposes and was in response to articles attributed to a local teachers' organization and a letter from the superintendent of schools, all of which appeared in local newspapers, urging passage of the tax increase. The Supreme Court, focusing implicitly on the content of the speech, concluded that "the question whether a school system requires additional funds is a matter of legitimate public concern" requiring "free and open debate." *Pickering*, 391 U.S. at 571–72, 88 S.Ct. at 1736.

*Rankin* similarly involved speech on a matter of public concern. In that case, Rankin, the constable of Harris County, Texas, fired McPherson, a deputy constable whose duties were "purely clerical" for stating, in response to the news that someone had attempted to assassinate the President of the United States, "if they go for him again, I hope they get him." *Rankin*, 107 S.Ct. at 2895. Viewing the statement "in context" the Supreme Court concluded that "it plainly dealt with a matter of public concern" because it "was made in the course of a conversation addressing the policies of the President's administration" and because it "came on the heels of a news bulletin regarding what is certainly a

---

16. While the Court concluded that most of Myers' questionnaire did not relate to matters of public concern, it held that the question relating to pressure to work on political campaigns for office-supported candidates did "touch" upon a matter of public concern "in only a most limited sense." *Connick*, 461 U.S. at 149, 154, 103 S.Ct. at 1691, 1694. This was so because of the question's content: "official pressure upon employees to work for political candidates not of the worker's own choice constitutes a coercion of belief in violation of fundamental constitutional rights" and "there is a demonstrated interest in this country that government service should depend upon meritorious performance rather than political service." *Id.* at 149, 103 S.Ct. at 1691 (citations omitted). Because a matter of public concern was involved, the Court applied the *Pickering* balancing test and concluded that Connick's decision to terminate Myers' employment did not infringe upon Myers' First Amendment rights.

matter of heightened public attention." *Id.* at 2898. The Court noted that "[t]he inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Id.*

Lower court efforts to draw more specific guidance from the Supreme Court's language and case law have resulted in a variety of statements and decisions. In *Wilson v. City of Littleton, Colorado,* 732 F.2d 765 (10th Cir.1984) this court examined the extent to which speech *"directly* addressed an important public issue." *Id.* at 768 (emphasis in original). In analyzing *Connick,* the court stated:

> in rejecting the other questions in Myers' questionnaire as outside the "rubric of matters of 'public concern,'" we do not understand the Court to be saying that the performance of a district attorney's office or of a district attorney as an elected official is not of public concern. Rather, it apparently was the Court's view that the other questions in Myers' questionnaire, while "related to an agency's efficient performance," did not *sufficiently inform the issue* as to be *helpful to the public in evaluating the conduct of government.*

*Id.* (citations omitted) (emphasis original in part, added in part). The court went on to conclude that:

> In order for a public employee's speech to be "of public concern," ... it is not always enough that "its *subject matter* could in [certain] circumstances, [be] the topic of a communication to the public that might be of general interest." What is actually said on that topic must itself be of public concern.

*Id.* at 769 (citations omitted) (emphasis original). Thus, this circuit has already indicated that what is of general interest to the public is not necessarily of public concern for First Amendment purposes. *See also Piver v. Pender County Bd. of Educ.,* 835 F.2d 1076, 1079–80 (4th Cir.1987) ("[T]he focus is ... upon whether the 'public' or the 'community' is likely to be truly concerned with or interested in the particular expression, or whether it is more prop-

erly viewed as essentially a 'private' matter between employer and employee.") (quoting *Berger v. Battaglia,* 779 F.2d 992, 998–99 (4th Cir.1985)); *Callaway v. Hafeman,* 832 F.2d 414, 416 (7th Cir.1987) ("The correlation implicit in premising free speech on the need for promoting social and political change ... is that speech that does not have such concerns as its goal will be afforded less protection generally, and specifically when viewed in the context of public employment cases."); *Wren v. Spurlock,* 798 F.2d 1313, 1317 n. 1 (10th Cir.1986) *cert. denied,* —— U.S. ——, 107 S.Ct. 1287, 94 L.Ed.2d 145 (1987) ("We recognize that it is not always enough that the subject matter of a communication be one in which there *might* be general interest, ... but that what is *actually said* on the topic is the crux of the public concern content inquiry.") (emphasis original; citations omitted); *Egger v. Phillips,* 710 F.2d 292, 316–17 (7th Cir.) *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983) ("[I]n assessing whether the speech touches upon a matter of public concern, it is important not to equate the public's curiosity about a matter with a matter having societal ramifications.").

After *Connick,* many courts have particularly focused on the extent to which the content of the employee speech was calculated to disclose wrongdoing or inefficiency or other malfeasance on the part of governmental officials in the conduct of their official duties. *See, e.g., Daniels v. Quinn,* 801 F.2d 687, 690 (4th Cir.1986) ("[T]his circuit has held that matters of public concern for these purposes must relate to wrongdoing or a breach of trust, not ordinary matters of internal agency policy."); *Cox v. Dardanelle Public School Dist.,* 790 F.2d 668, 672 (8th Cir.1986) ("The focus is on the role the employee has in advancing the particular expressions: that of a concerned public citizen, informing the public that the state institution is not properly discharging its duties, or engaged in some way in misfeasance, malfeasance or nonfeasance; or merely as an employee, concerned only with internal policies or practices which are of relevance only to the employees of that institution."); *Knapp v.*

*Whitaker,* 757 F.2d 827, 840 (7th Cir.) *cert. denied,* 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed. 2d 29 (1985) (In finding that the employee/school teacher's communications with school board members concerning classroom assignments and personal evaluations was not on a matter of public concern, the court stated that the employee's speech "was not an attempt to inform the public that the administrators in District 150 were failing to discharge their governmental responsibilities," and it "was not aimed at uncovering a wrongdoing or breach of the public trust."); *McKinley v. City of Eloy,* 705 F.2d 1110, 1114 (9th Cir.1983) ("Speech by public employees may be characterized as not of 'public concern' when it is clear that such speech deals with individual personnel disputes and grievances and that the information would be of no relevance to the public's evaluation of the performance of governmental agencies.").[17]

The Seventh Circuit has turned this aspect of the analysis into an inquiry into the motive of the speaker. *See Callaway v. Hafeman,* 832 F.2d 414, 417 (7th Cir.1987) ("the *Connick* 'test requires us to look at the *point* of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?'") (quoting *Linhart v. Glatfelter,* 771 F.2d 1004, 1010 (7th Cir.1985)).

As the Supreme Court has explicitly stated, context is also important. While the Court has made clear that "[t]he private nature of the statement does not ... vitiate the status of the statement as addressing a matter of public concern," *Rankin,* 107 S.Ct. at 2898 n. 11 (citing *Givhan v. Western Line Consolidated School Dist.,* 439 U.S. 410, 414–16, 99 S.Ct. 693, 695–97, 58 L.Ed.2d 619 (1979)), other aspects of the context of the employee's communication may affect the public concern inquiry. In *Connick,* the Supreme Court viewed the employee's speech (the questionnaire) as essentially growing out of and as merely an extension of an underlying employment dispute. The employee comment in *Rankin,* although clearly private and occuring while on the job, as in *Connick,* was in the context of a discussion of the President's policies and can, therefore, be viewed as itself "political speech" or the "hyperbolic

---

**17.** Accordingly, where an employee sought to disclose wrongdoing, inefficiency or malfeasance courts have typically found speech on matters of public concern. *See, e.g., Southside Pub. School v. Hill,* 827 F.2d 270 (8th Cir.1987) (school teachers' complaints regarding deficiencies in implementation of federal handicapped pupil program were on matters of public concern"); *Marohnic v. Walker,* 800 F.2d 613 (6th Cir.1986) (speech consisting of talking to and cooperating with attorney general's investigation into possible fraudulent billing by public agency touched on matter of public concern); *Wren v. Spurlock,* 798 F.2d 1313 (10th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1287, 94 L.Ed.2d 145 (1987) (letter from teachers to an education association seeking an investigation and complaining of high faculty turnover and sexual harassment of students and teachers was on a matter of public concern); *Brasslett v. Cota,* 761 F.2d 827 (1st Cir.1985) (comments by fire chief to local press concerning the level of fire protection of town were "prototypical matter of public concern"); *Czurlanis v. Albanese,* 721 F.2d 98 (3d Cir.1983) (employee allegations of inefficiency, fraud and waste in Division of Motor Vehicles were on matters of public concern); *McKinley v. City of Eloy,* 705 F.2d 1110 (9th Cir.1983) (speech concerning rate of compensation for police force and working relationship between police union and elected officials was on matter of public concern); *Key v. City of Rutherford,* 645 F.2d 880 (10th Cir.1981) (communication by police chief to mayor concerning increasing police department budget so as to improve level of police protection was on matter of public concern); *Wulf v. City of Wichita,* 644 F.Supp. 1211 (D.Kan.1986) (letter alleging misconduct by police chief, including interference with right of union membership and misuse of public funds, and requesting official investigation, was on matter of public concern); *cf. Saye v. St. Vrain Valley School Dist. RE–1J,* 785 F.2d 862 (10th Cir.1986) (complaint concerning allocation of aide time among teachers was "not a matter inherently of public concern"); *Jurgensen v. Fairfax County,* 745 F.2d 868 (4th Cir.1984) (release to press of internal police audit report detailing grievances concerning working conditions but not exposing any illegality, abuse of authority, corruption or waste was not on matter of public concern); *Wilson v. City of Littleton,* 732 F.2d 765 (10th Cir.1984) (wearing by police officer of black shroud on badge as personal expression of grief at death of another officer was not on matter of public concern.)

expression of a political opinion." *Am. Postal Workers Union, AFL–CIO v. United States Postal Service,* 830 F.2d 294, 320 (D.C.Cir.1987) (Bork, J. dissenting). The employee letter in *Pickering* publicly expressed criticism of the school board in the face of previous articles and a letter publicly expressing the school board's own position. *See also, e.g., Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (college teacher's legislative testimony in favor of granting four-year status for college found to be on matter of public concern); *Piver v. Pender County Bd. of Educ.,* 835 F.2d 1076, 1080 (4th Cir.1987) ("The [employee] speech took place primarily in a public meeting called for the purpose of discussing [a school principal's] tenure" and it was "directed to a small community in which the speaker and the subjects of his speech were personally known by almost everyone."); *Saye v. St. Vrain Valley School Dist. RE–1J,* 785 F.2d 862, 866 (10th Cir.1986) (In holding that teacher's complaints about allocation of aide time among teachers did not involve a matter of public concern, court noted that "Saye did not raise the aide issue in a public forum."); *Waters v. Chaffin,* 684 F.2d 833, 837–38 (11th Cir.1982) (police officer's criticism of police chief while off-duty and out of uniform was protected).

■ With those general guidelines in mind, we turn to the content, form and context of Koch's speech to determine if it addressed a matter of public concern, the threshold inquiry in the *Pickering* balancing test. We hold that it did not.

With regard to the content and form of Koch's speech, his official report stated his professional opinion as to the cause of a fire in which a small child died. As we have indicated, we view the fact that his speech took place in a report in the course of his official duties as a factor which weighs against, in the circumstances of this case, a finding that his speech involved matters of public concern for the purposes of the First Amendment. His written re-

port was simply one of many routine official reports which are processed through the City's local governmental agencies on a daily basis. While the conduct of local government is, broadly speaking, an obvious matter of public concern, absent a more compelling circumstance than the simple fact that Koch's report was a routine governmental report, we conclude that Koch's expressed opinion in his report does not address a matter of public concern. In view of other aspects of the content, form and context of his report, we find no such compelling circumstance.

As the Supreme Court has stated, speech "not otherwise of public concern does not attain that status because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest." *Connick,* 461 U.S. at 148 n. 8, 103 S.Ct. at 1691 n. 8. We certainly agree that the City's discharge of its duty to investigate fires and determine their cause could be a matter of great public concern. Similarly, Koch's own competence to perform his job could be a matter of public concern, as could the cause of a fire in which a person died or a disagreement between city officials as to that cause. Nonetheless, Koch's report did not "sufficiently inform the issue as to be helpful to the public in evaluating the conduct of government." *Wilson,* 732 F.2d at 768 (emphasis removed); *see also Callaway v. Hafeman,* 832 F.2d 414, 417 (7th Cir.1987) (While the plaintiff school employee's "communications touched upon an issue of public concern generally, she was not attempting to speak out as a citizen concerned with problems facing the school district.").[18] And while Koch's speech may indeed not have been motivated by personal interest, that fact alone does not transform his speech into speech on a matter of public concern.

Koch asserts that his speech "was calculated to inform and alert the public about the city government's discharge of its duty

---

18. Contrary to Koch's suggestion, we do not view his offical report on the cause of a fire as speech on a matter "inherently" of public concern, as the Supreme Court in *Connick,* 461 U.S.

at 148 n. 8, 103 S.Ct. at 1691 n. 8, characterized the plaintiff's protest of racial discrimination in *Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979).

to investigate arson" and that his "objective was to inform his superiors of what he believed to be arson and then the public of what he believed was defendants' misfeasance," Supplemental Brief of Appellant at 8 (quoting *Koch v. City of Hutchinson,* 814 F.2d 1489, 1498 (10th Cir.1987)). The record simply does not support such a conclusion. Koch's deposition reveals that he had compiled a list of alleged improprieties on the part of certain City officials, including several defendants in this case, which he hoped to reveal in the course of his state and federal lawsuits. In his testimony Koch suggested that O'Sullivan's investigation of him and O'Sullivan's involvement of other law enforcement personnel was, in Koch's view, improper. Koch's counsel attempted throughout the trial to discredit the validity of the other investigators' reports and investigative techniques. But there is no evidence that Koch's fire investigation report and his conclusion as to the cause of the fire was in any way motivated or inspired by such alleged improprieties or by the desire to expose those improprieties.

Koch's remaining two arguments concerning media publicity of his report and subsequent events and public access to the report through the Kansas "sunshine" laws do not persuade us that his speech addressed a matter of public concern.

Koch argues, citing *Wichert v. Walter,* 606 F.Supp. 1516 (D.N.J.1985), "[t]hat the arson was a 'major topic' in Hutchinson and 'generated' newspaper headlines in the local newspaper only cements the public concern aspect of plaintiff's speech." Supplemental Brief of Appellant at 19.[19] Media publicity of the dispute is not determinative of the question of whether Koch's speech was on a matter of public concern for First Amendment purposes. We agree with the Seventh Circuit when it stated:

> We do not believe, however, that the scope of an employee's freedom of speech can turn on his ability to convince a newspaper to print a story about his

plight. The factors which determine whether a story is newsworthy are hardly coterminus with the factors which determine whether the communication has societal ramifications, and in any event, newspaper editors cannot decide the question for us.

*Egger v. Phillips,* 710 F.2d 292, 317 (7th Cir.), *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983). The fact that Koch himself did not disclose the contents of his report to the local media does not change our view that media publicity cannot be determinative of whether an employee's speech is protected by the First Amendment. *See also Connick,* 461 U.S. at 160 n. 2, 103 S.Ct. at 1697 n. 2 (Brennan, J. dissenting) (majority opinion found Myers' questionnaire, with one exception, did not touch matters of public concern despite "extensive local press coverage"); *but see Germann v. Kansas City,* 776 F.2d 761, 764 n. 2 (8th Cir.1985), *cert. denied,* — U.S. ——, 107 S.Ct. 63, 93 L.Ed.2d 22 (1986) ("[B]ecause appellant's letter concerned implementation of the fire plan during a time of great media attention, it addressed a matter of public concern"); *Monsanto v. Quinn,* 674 F.2d 990, 997 (3d Cir.1982) ("[W]here ... the communication concerns an issue of public interest, as evidenced by the local news media's assessment that the communication is newsworthy, 'entirely different considerations ... come into play.' ") (quoting *Roseman v. Indiana Univ.,* 520 F.2d 1364, 1368 n. 11 (3d Cir.1975), *cert. denied,* 424 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 329 (1976)). Accordingly, the fact that Koch's report and ensuing events received some media coverage does not convince us that his speech touched upon a matter of public concern for purposes of the First Amendment.

Finally, Koch relying on the majority opinion of the previous panel of this court, argues that Kansas law gives the public access to investigative reports prepared by Fire Marshals such as Koch under Kansas

---

**19.** A pretrial conference order lists among plaintiff's exhibits numerous newspaper articles dating from the time of the fire to August, 1980, and covering the actual fire and ensuing events up to and including Koch's lawsuits. R. Vol. I at 49–51. The record reveals that seven articles appeared concerning the fire, the dispute between Koch and others as to the cause of the fire, and Koch's suspension and demotion.

"sunshine" acts. *See* Kan.Stat.Ann. §§ 31–137 and 45–215. Accordingly, Koch claims that such reports are of public concern within the meaning of the First Amendment. We disagree. Even assuming that Kansas law does grant public access to investigative reports such as Koch's, we hold that such public access under state sunshine laws is irrelevant to the question of whether such reports contain information of public concern for the purposes of the First Amendment. We agree with the Fifth Circuit which strongly rejected the argument that a public employee's speech addressed a matter of public concern because the employee's statement was public under applicable state law, stating:

> Though a state may choose to provide broader rights under its own laws than those granted by the federal Constitution, it has no power to enlarge the scope of federal rights themselves. Whether or not the state of Texas would characterize the speech in question as addressed to a matter of public concern is therefore irrelevant to the federal issue.

*Gomez v. Texas Dept. of Mental Health and Mental Retardation*, 794 F.2d 1018, 1022–23 (5th Cir.1986) (citations omitted). The fact that Koch's investigative report on the cause of a fire may be accessible to the public under applicable Kansas law has no bearing upon the question of whether such a report touches upon matters of public concern within the meaning of the First Amendment.

In sum, considering the content, form and context of Koch's speech, we hold that it did not involve a matter of public concern for the purpose of the First Amendment.

### D. *Balancing Under Pickering.*

Even were we to conclude that Koch's speech touched, even tangentially, upon a matter of public concern, we would nonetheless conclude that it is unprotected under the First Amendment because it fails the *Pickering* balancing test.

As indicated, *Pickering* requires us to balance the interests of the employee in making the statement at issue against the interests of the state, as an employer, in promoting the efficient provision of services. "In performing the balancing, the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin*, 107 S.Ct. at 2898 (citing *Connick*, 461 U.S. at 152–53, 103 S.Ct. at 1693; *Givhan v. Western Consolidated School Dist.*, 439 U.S. 410, 415 n. 4, 99 S.Ct. 693, 696 n. 4, 58 L.Ed.2d 619 (1979)).[20]

The Supreme Court has "recognized as pertinent considerations whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 107 S.Ct. at 2899 (citing *Pickering*, 391 U.S. at 570–73, 88 S.Ct. at 1735.). The government's interest in the *Pickering* balancing therefore "focuses on the effective functioning of the public employer's enterprise." *Id.*

*Rankin* has further made clear that the employee's responsibilities within the workplace are relevant to the *Pickering* balancing. "The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and

---

**20.** Different considerations may come into play in the *Pickering* balance, depending on whether the employee's speech is made in a public or private forum.

When a teacher speaks publicly, it is generally the *content* of his statements that must be assessed to determine whether they "in any way either impeded the teacher's proper performance of his daily duties in the classroom or ... interfered with the regular operation of the schools generally." Private expression, however, may in some situations bring additional factors to the *Pickering* calculus. When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered. *Givhan v. West. Line Consol. School Dist.*, 439 U.S. 410, 415 n. 4, 99 S.Ct. 693, 696 n. 4, 58 L.Ed.2d 619 (1979).

public accountability the employee's role entails." *Id.* at 2900; *see also Jurgensen v. Fairfax County,* 745 F.2d 868, 880 (4th Cir.1984) ("In considering the second part of the *Pickering–Connick* test, courts must give weight to the nature of the employee's job in assessing the possible effect of his action on employee morale, discipline or efficiency."); *Egger v. Phillips,* 710 F.2d 292, 319 (7th Cir.1983) ("While these interests [of the government as employer] are ever present, their strength and applicability in any given employment situation depend on both the nature of the tasks performed by the particular employee and the mission of the agency for which he works."); *McKinley v. City of Eloy,* 705 F.2d 1110, 1115 (9th Cir.1983) ("plaintiff was simply a rank and file public officer."). In *Rankin,* the fact that the employee's duties included "no confidential, policymaking, or public contact role" was a factor weighing in favor of the employee's interest in making the speech at issue. *Rankin,* 107 S.Ct. at 2900.

Finally, different considerations come into play if the disputed speech reflects negatively on the employee's ability and competence to perform his or her job. The Supreme Court in *Pickering* specifically noted that:

> [T]his case does not present a situation in which a teacher's public statements are so without foundation as to call into question his fitness to perform his duties in the classroom. In such a case, of course, the statements would merely be evidence of the teacher's general competence, or lack thereof, and not an independent basis for dismissal.

*Pickering,* 391 U.S. at 573 n. 5, 88 S.Ct. at 1737 n. 5; *see also Rankin,* 107 S.Ct. at 2899 (Rankin's discharge "was not based on any assessment by the constable that the remark demonstrated a character trait that made respondent unfit to perform her work."); *Wren v. Spurlock,* 798 F.2d 1313, 1318 (10th Cir.1986) ("In view of this evidence of Wren's continuing competence, the *Pickering* balance tips in her favor.");

*Egger,* 710 F.2d at 318 ("To the extent that the disagreements between [plaintiff] and [employer] represent a professional difference of opinion regarding the strength of the case against [a co-employee], [plaintiff's] communications could be viewed as evidence of a lack of professional competence, and a recommendation based on such an assessment of the communications implicates internal agency concerns.").

■ Applying those factors to this case, we hold that the *Pickering* balance clearly tips in favor of the employer, the City. As the Supreme Court has stated, the manner, time and place of employee speech are relevant to the *Pickering* balance, as is the context of the speech. Koch's speech occurred in the course of and as a part of his official duties. While we have declined to establish a *per se* rule regarding speech made as a part of an employee's official functions, the fact that the speech occurs in such a situation is an important factor in the *Pickering* balancing, just as it is a factor in the threshold public concern inquiry. *See Connick,* 461 U.S. at 153, 103 S.Ct. at 1693 ('[T]he fact that [the employee] ... exercised her rights to speech *at the office* supports [the employer's] fear that the function of his office was endangered.") (emphasis added).

Furthermore, we hold that the City was entitled to evaluate Koch's official report, prepared and submitted in the course of his normal duties as Fire Marshal, as a reflection upon his ability and competence to perform his job. Accordingly, the City was entitled to view Koch's report as reflecting negatively upon his ability and competence because of, among other things, its omission of the laboratory analysis suggesting a possible accidental cause of the fire.[21] Indeed, Koch's demotion was based in part on his omission of the laboratory analysis and on a "lack of confidence ... in his ability to rationally and professionally conduct an investigation." R.Supp. Vol. XIX, Pl.'s Ex. 10.

---

21. Koch's immediate superior, Fire Chief Jones, testified that "good judgment" would have required inclusion of the lab report. R. Vol. XI at

177. Koch himself testified that inclusion of the report "would have improved the technicality of the report." R. Vol. XV at 1411.

We agree with the Seventh Circuit's discussion of this point in *Egger, cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983):

> From the interview with an applicant for a position to discussions with the employee about the proper discharge of his duties, the content of an employee's speech naturally affects his superior's assessment of him and forms the basis of personnel decisions. ... [The employee's superior in this case] was entirely justified in evaluating the soundness of [the employee's] investigative technique, the inferences he drew from certain informant statements, and the overall soundness of his conclusion that certain leads were worth pursuing. ... [The employee] was simply doing his job as a criminal investigator, and the quality of that work was something [his superior] routinely had to assess.

*Egger,* 710 F.2d at 316, 317, 318 (citations omitted). Similarly, Koch's superiors were justified in "evaluating the soundness" of his "investigative technique, the inferences he drew" from certain evidence, and "the overall soundness of his conclusion" that the fire was the result of aggravated arson. Koch's superiors were therefore entitled to consider the content of his investigative report, including his opinion as to the causation of the fire, in evaluating his competence to perform his job.

Additionally, there is evidence that Koch's report had a "detrimental impact on close working relationships for which personal loyalty and confidence is necessary," within the meaning of *Rankin,* 107 S.Ct. at 2899. The record discloses that Koch's report generated considerable friction and disharmony between Koch and O'Sullivan, who, although not Koch's immediate superior, was the person to whom Koch's report was addressed and the person who had to decide, based at least in part on Koch's report, whether further action was required in connection with the fatal fire. Koch's report, with its omission of the laboratory report, prompted an investigation by O'Sullivan because he felt the omission, as well as Koch's statement to him in the May 30 meeting that the laboratory results were

"negative," might constitute official misconduct. The investigation, with its resultant reports by other investigators which conflicted with Koch's report, confirmed O'Sullivan's and Jones' concerns about Koch's competency and itself generated further friction between Koch and other agencies and investigators. Jones testified that in the May 30 meeting between himself, Koch, O'Sullivan and others, Koch refused to explain the basis for his conclusions that arson caused the fire. R. Vol. XII at 364–65. Jones further testified that O'Sullivan felt he could not "sit down with and conduct a constructive interview" with Koch, R. Vol. XII at 381, and that others who investigated the fire found Koch uncooperative. *Id.* at 500–01. Furthermore, O'Sullivan's July 13 letter to Jones, detailing his concerns regarding the whole affair, explicitly stated that he had a "total *lack of confidence* in his [Koch's] opinion and *in his ability to rationally and professionally conduct an investigation,*" and that he would "not accept a report from ... [Koch] as the basis of a criminal charge nor do I feel that I could ever call him as a State's witness and sponsor him as credible and reliable." Pl.'s Ex. 10 (emphasis added). Accordingly, while significant disharmony between Koch and others occurred during the investigation subsequent to his report, the report was the event which triggered those investigations and subsequent disruption of working relationships. *Cf. Rankin,* 107 S.Ct. at 2899 (no evidence that the employee's statement interfered with the efficient functioning of the office); *Jungels v. Pierce,* 825 F.2d 1127, 1132 (7th Cir.1987) (no evidence of disruption of employer operations); *Czurlanis v. Albanese,* 721 F.2d 98, 106 (3d Cir.1983) ("[T]here is no evidence that the relationship between [the employee] and his immediate superiors was seriously undermined."); *Brasslett v. Cota,* 761 F.2d 827, 845 (1st Cir.1985) (no evidence of detrimental impact in necessary working relationship).

The nature of the ongoing working relationship between Koch, O'Sullivan and other agencies underscores the significance of

the City's interest in preventing disruption of those relationships. "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick,* 461 U.S. at 151–52, 103 S.Ct. at 1692. Jones testified as to the importance of having a good working relationship between members of the Fire Marshal's office and the police whenever a fire results in a fatality. R. Vol. XII at 501–02. O'Sullivan testified that "every time there was ... a[n arson] fire, the police department became involved." R. Vol. XVI at 1572. As Koch's own testimony indicated, his office and the police investigate simultaneously and communicate continuously concerning any fire in which a fatality occurs.[22] O'Sullivan further testified that, if a criminal prosecution were instituted, he would ordinarily rely on Koch as his "chief witness". R.Vol. XVI at 1729. He stated as follows concerning his reliance on the Fire Marshal's report in prosecuting an arson case:

> I had to be personally satisfied or convinced myself from any case that I ever filed that the person accused did the acts that he was accused of, and that that constituted a criminal offense. And ever [sic] witness that I then use to prove that charge, I had to have absolute confidence in, especially in a case where you're talking about an area in which my witness has greater expertise than I do. ... And I felt like I had to have absolute confidence in the objectivity and the professionalism of the person whose opinion I was advocating before I would proceed

on a case, and in this particular case, I did not have that in Tom Koch, I did not feel that I ever would, and frankly, did not want him coming over to the office any more with his opinions because I wouldn't proceed in a criminal case based upon his opinion.

R.Vol XVI at 1586. The City Manager, Pyle, testified that there was an "absolute requirement that they [Koch and the county attorney] cooperate with each other." R. Vol. XIV at 1114. Accordingly, although Koch and O'Sullivan did not work together on a daily basis, they could, in arson prosecutions, have a working relationship requiring mutual trust and confidence. *See also Saye v. St. Vrain Valley School Dist.,* 785 F.2d 862, 866 (10th Cir. 1986) (Speech was sufficiently disruptive, and therefore unprotected, where it affected relationship between parents of special education children and teachers).

Finally, Koch's position within the workplace and his responsibilities further persuade us that the *Pickering* balance clearly tips in favor of the City. Unlike the "purely clerical" employee in *Rankin,* whose speech was protected under the First Amendment, Koch had a greater "confidential, policymaking, or public contact role." *See Rankin,* 107 S.Ct. at 2900. Koch's duties included the investigation of fires and the determination of cause, as well as the supervision of subordinate fire inspectors. He obviously had contact with the public in the course of those investigations and exercised considerable professional expertise and discretion in conducting such

---

**22.** A number of cases have emphasized the heightened governmental interest in maintaining harmony among employees in the law enforcement context, where "[m]utual trust and respect among [employees] ... are particularly important" and "[t]he need for confidentiality cannot be gainsaid." *Egger,* 710 F.2d at 319; *see also Brasslett v. Cota,* 761 F.2d 827, 845 (1st Cir.1985) ("[T]rust and confidence were essential to an effective working relationship between the Fire Chief and the Town Manager."); *Jurgensen,* 745 F.2d at 880, ("In a case ... involving ... employment in a police department, it is important ... to take account of the special character of such department in determining the matter of 'the government's interest.'"); *Waters,* 684 F.2d at 839 (police department has particular interest in maintaining discipline and "*esprit de corps.*"). We view the function of the Fire Department in which Koch worked to be sufficiently analogous to police departments and FBI agencies to produce a heightened governmental interest in maintaining harmony among employees of the Fire Department, such as Koch, and other law enforcement personnel. *See generally Germann v. Kansas City,* 776 F.2d 761, 764 (8th Cir.1985), *cert. denied,* — U.S. ——, 107 S.Ct. 63, 93 L.Ed.2d 22 (1986) (court noted necessity of personal loyalty to fire chief); *Bickel v. Burkhart,* 632 F.2d 1251, 1257 (5th Cir. Unit A 1980) ("Because of the nature of firefighting and its higher stakes, operational efficiency and harmony among co-workers are critical.")

investigations. His opinion as to the cause of a suspicious fire would be a factor in the decision of the county attorney to investigate further and possibly file criminal charges in connection with a fire. In sum, Koch's job entailed the exercise of judgment, discretion and authority, in contrast with the job of the plaintiff in *Rankin,* and therefore the City had a greater interest in considering his speech when making an employment decision.

We have considered the many factors applicable to the *Pickering* balancing test and hold that the City's interest in implementing a personnel decision on the basis of Koch's speech in the circumstances of this case clearly outweighed his interest in making the speech in question. Koch's written report reflected upon his competency and ability to perform his job and caused evident disruption of necessary working relationships between Koch and others. As a result, the City's ability to efficiently perform its necessary duties was significantly impaired. We therefore hold that the City did not violate Koch's First Amendment rights when it demoted him from Fire Marshal to Fire Prevention Inspector.

## CONCLUSION

For the foregoing reasons we affirm the judgment of the district court granting judgment n.o.v. to the City, setting aside the jury verdict in Koch's favor and entering judgment for the City.

McKAY, Circuit Judge, concurring statement:

I concur in the court's opinion. The key in the difficult task of applying the general principles to the facts of this case lies in the fact that official reports cannot be immunized from competency judgments just because they involve subjects which are inherently dramatic and likely to attract public attention. I am satisfied that the court's opinion takes into account all the relevant factors and gives them, on balance, the proper weight.

LOGAN, Circuit Judge, with whom Judge SEYMOUR joins, dissenting:

With respect, I must dissent from the en banc court's analysis of what is a matter of public concern and its application of the balancing test of *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In my opinion, the en banc court takes an unprecedented step by constricting the First Amendment protection of public employees who must investigate and report on controversial matters. The court also unjustifiedly supplants the jury's verdict with its own view of the evidence, in order to conclude under the *Pickering* test that the City of Hutchinson's interest in regulating Thomas Koch's speech clearly outweighs Koch's interest in stating his conclusion.

To focus properly, we must identify the precise issues presented to this court for review. The jury resolved all of the factual issues against the City of Hutchinson. The City neither complains of the jury instructions or verdict form nor argues that the evidence was insufficient to support the jury's verdict. The district court based its grant of judgment n.o.v. on the sole ground that Koch's "speech involved in this case cannot fairly be characterized as relating to a matter of 'public concern' and therefore the speech is not protected under the First and Fourteenth Amendments." I R. 365. The order granting en banc rehearing was limited to the issues discussed in the "protected speech" section of the panel majority's opinion and the dissent, which focused on Koch's report as a "statement of his conclusions as a public employee limited to a matter within his official duties." *See Koch v. City of Hutchinson,* 814 F.2d 1489, 1500 (10th Cir.1987) (Seth, J., dissenting).

In addressing this issue, the City sets forth three alternative arguments. First, the City advocates a per se rule that a public employee's statements made in the ordinary course of business can never be protected speech. Second, it argues that the speech here cannot be regarded as a matter of public concern. Finally, it asserts that even if Koch's statement is

found to touch on a matter of public concern, that finding does not justify the broader conclusion that it is protected speech as defined in *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

With respect to the City's first argument, I agree with the majority that there should be no per se rule denying First Amendment protection to speech uttered in the ordinary course of a public employee's business duties. Where I really part company with the majority is on the second issue—whether this speech touches on a "matter of public concern." The majority correctly states the law in the context in which this issue usually arises: where the question is whether the speech that caused an employee's discharge was mere griping or agitation over working conditions or internal policy decisions affecting the employee, as opposed to political commentary on an issue of public concern. That is, did the employee speak as employee or as citizen? Sometimes the lines are hard to draw, but I generally agree with the balance the courts have struck when the issue is presented in this context.

Here, in contrast, we face a different situation: Koch is speaking "as an employee," and, although his speech is not pure political commentary, it also is not upon matters only of personal interest. Koch's report did not express a complaint about working conditions or internal policy. Instead, it stated that he believed a fire which claimed the life of a child had been deliberately set. Surely the majority would agree that the cause of a fatal accident at a nuclear power plant would be a matter of grave public concern, on a regional and perhaps national scale. The cause of a fire in which someone dies, particularly if that cause might be arson, stimulates grave concern on a local level. And when, as in this case, law enforcement officials disagree about how such a fire started, the public should know about this disagreement, if for no other reason than to assess the conduct of government officials. *See*

*Connick,* 461 U.S. at 148, 103 S.Ct. at 1691; *id.* at 161, 103 S.Ct. at 1697 (Brennan, J., dissenting) ("Unconstrained discussion concerning the manner in which the government performs its duties is an essential element of the public discourse necessary to informed self-government").[1]

The majority applies the "content, form and context" analysis of *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690, concluding: "absent a more compelling circumstance than the simple fact that Koch's report was a routine governmental report, ... Koch's expressed opinion in his report does not address a matter of public concern." At 1447. The majority views the context and form of Koch's speech—a "routine governmental report"—as weighing strongly against a finding of "public concern." I believe the majority misapprehends the basis of the content, form and context analysis required by *Connick.* In *Connick,* the context of the speech—a disgruntled employee challenging office policies—counseled strongly against finding her speech to address a matter of public concern. *See* 461 U.S. at 148, 103 S.Ct. at 1691. In that context, her speech had little or no value in informing public debate. Had the employee's questionnaire not been motivated by purely private concerns and had she sought "to inform the public that the District Attorney's Office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases ... [or] to bring to light actual or potential wrongdoing or breach of public trust on the part of Connick and others," *id.,* her speech, though concerning only intra-office policies, might have been quite helpful to the public in evaluating the performance of a public institution. Thus, in a different context, her speech might have merited First Amendment protection.

The context of Koch's speech—an official report prepared pursuant to duty—is quite different from the context of the speech in *Connick.* That Koch has spoken in his position as fire marshal rather than as a

---

1. Of course, a holding that speech addresses a matter of public concern only *qualifies* the speech for First Amendment protection; it does not *guarantee* that the speech will be protected. *See Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734.

"citizen" does not make his speech of less value to "informed decision-making by the electorate." *Pickering*, 391 U.S. at 572, 88 S.Ct. at 1736; *Connick*, 461 U.S. at 145, 103 S.Ct. at 1689. If anything, his duties and qualifications make this official speech *more* valuable. That Koch announced his conclusion in the form of an official report rather than in a press conference also does not diminish the value of the speech nor vitiate its status as addressing a matter of public concern. As the Supreme Court has held, "Neither the [First] Amendment itself nor our decisions indicate that [the] freedom [of speech] is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public." *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 415–16, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619 (1979); *see also Rankin v. McPherson*, —— U.S. ——, 107 S.Ct. 2891, 2898 n. 11, 97 L.Ed.2d 315 (1987).[2]

The majority's result places government employees whose duties require conclusions on issues of intense public concern in an untenable position. Will a district attorney dare seek an indictment in a case of corruption of a popular official? Could a staff member of the Warren Commission conclude President Kennedy was shot for arranging an attempted Mafia assassination of Fidel Castro when the duty is to determine why Kennedy was assassinated? Will the county coroner report that a jail prisoner died of beatings rather than suicide? The majority's narrow construction of "public concern" leaves a host of public servants, including fire marshals, police, and coroners, under pressure not to report unpopular conclusions. This result is directly at odds with the Supreme Court's rationale for protecting speech in the public workplace. As the Court held in *Rankin:* "Vigilance is necessary to ensure that public employers do not use authority over

employees to silence discourse … simply because superiors disagree with the content of employees' speech." at ——, 107 S.Ct. at 2896.

My conclusion that a report of arson is a matter of public concern is fully consonant with the post-*Connick* case law cited by the majority. *See* cases cited in majority opinion at 1445–46. In fact, a reader would anticipate from the manner in which the majority opinion describes the precedents that it is building up to a finding of public concern, rather than its opposite. For example, *Piver v. Pender County Board of Education*, 835 F.2d 1076 (4th Cir.1987), cited by the majority, at 1445, focuses "upon whether the 'public' or the 'community' is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a 'private' matter between employer and employee." *Id.* at 1079–80 (quoting *Berger v. Battaglia*, 779 F.2d 992, 998–99 (4th Cir.1985) (citations omitted)). The cause of a fatal fire is not just a private matter between employee and employer; rather, it is of true concern to the citizenry and thus, under *Piver*, a matter of public concern. Koch's speech would qualify similarly as being on a matter of public concern under the other cases the majority paraphrases. *See, e.g.*, at 1445, citing to *Callaway v. Hafeman*, 832 F.2d 414, 416 (7th Cir.1987); *Wren v. Spurlock*, 798 F.2d 1313, 1317 & n. 1 (10th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1287, 94 L.Ed.2d 145 (1987); and *Egger v. Phillips*, 710 F.2d 292, 316–17 (7th Cir.), *cert. denied*, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed. 2d 262 (1983). Reason, sound policy, and precedent all suggest that it is absurd to conclude that the statement, "It is my opinion this was an aggravated arson fire," was not on a matter of public concern.

---

**2.** The panel opinion mentioned that the fire marshal's reports are public information, *Koch*, 814 F.2d at 1498, merely to underscore that it was certain that Koch's report identifying a fire as caused by aggravated arson was going to become public knowledge. We do not have to go so far as to analyze the right to search public records, because Reno County Attorney Joe

O'Sullivan recognized it as a public concern matter when he gave the story to the newspaper reporter. Indeed, O'Sullivan's testimony at trial was that Koch accused him of a coverup in the arson investigation by not releasing Koch's report to the newspapers, and that Koch thought the law required public release within fifteen days. *See* XVI R. 1576, 1742.

On the en banc majority's view that this case involves no speech of public concern, it need not have reached the *Pickering* balancing test. But finding the speech to be on a matter of public concern does not end the inquiry. We must take the next step and apply the *Pickering* test. As the majority opinion notes, that test requires the court "to balance the interests of the employee in making the statement at issue against the interests of the state, as an employer, in promoting the efficient provision of services." At 1449; *see Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734. The government bears the burden of demonstrating that its interests outweigh the interests of the speaker. *Rankin*, at ——, 107 S.Ct. at 2898–99. If the government fails to carry this burden, the speech is protected.

The majority sets forth several reasons for tipping the *Pickering* balance in favor of the City of Hutchinson. First, the majority again weighs against Koch the fact that his speech was made in an official report. At 1450. But the majority provides no rationale for assigning the presumption against the employee; and as a general proposition the fact that the speech is contained in an official report should weigh in favor of the employee under *Pickering*. The government's interests "in promoting the efficiency of the public services it performs through its employees," *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734 generally are advanced, not impaired, by protecting its decisionmakers' exercise of discretion. Fire marshals who can be demoted or terminated merely for arriving at an unpopular conclusion will be less likely to perform the job correctly and efficiently. Failing to protect the fire marshals' speech will chill the exercise of their discretion just as the threat of libel judgments would chill the news media's discussion of public issues and events. As the Court emphasized in *Pickering*, "the threat of dismissal from public employment is … a potent means of inhibiting speech." 391 U.S. at 574, 88 S.Ct. at 1737.

The majority, however, ignores the governmental interests in protecting speech in official reports and looks only at the "disruptive" aspects of Koch's statement. The relevant considerations on this aspect, as the majority declares, are whether the statement (1) impairs discipline or harmony on the job, (2) has a detrimental impact on necessarily close working relationships, or (3) impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise. At 1449. This test requires courts to determine whether the particular speech in the particular context would be inherently or necessarily inflammatory and disruptive of the working relationships on the employee's job.

In *Pickering* the Supreme Court asked whether the speech at issue could "be regarded as *per se* detrimental," and asked whether it would "normally have any necessary impact" on the operations of the workplace. 391 U.S. at 571, 88 S.Ct. at 1736. The instant case illustrates the problem perfectly. Does the mere fact that a fire marshal concludes that a fire he investigated was arson necessarily impair discipline or harmony with those with whom the marshal works, or detrimentally affect working relationships, or impede the performance of the marshal's duties? Of course not. This situation is unlike the one that would exist if Koch had encouraged citizens of Hutchinson to torch older buildings, or if an assistant prosecuting attorney commented favorably upon vigilantes taking the law in their own hands. Yet consider the effect Koch's demotion is likely to have on the next person to hold his position. Will the new fire marshal want to reach a conclusion with which county attorney O'Sullivan will disagree? Will he defend his conclusion as vigorously as did Koch?

If speech is not per se disruptive, then the government must prove that the speech on matters of public concern actually created disruption in the workplace. *See Rankin*, at ——, 107 S.Ct. at 2898–99; *Pickering*, 391 U.S. at 570–71, 88 S.Ct. at 1735–36. When the government introduces some evidence of disruption, the court's role involves some weighing of the evidence. But the court must be careful not to go too far and determine issues that are properly for

the factfinder. *See Pickering,* 391 U.S. at 578 n. 2, 88 S.Ct. at 1740 n. 2 ("even in cases where the upholding or rejection of a constitutional claim turns on the resolution of factual questions, we also consistently give great, if not controlling, weight to the findings of the state courts") (appendix to opinion of the Court).

After weighing the evidence for itself the majority holds that the City, based upon county attorney O'Sullivan's recommendations, was entitled to evaluate the report as reflecting negatively upon Koch's ability and competence to perform his job, partly because of his omission of the laboratory analysis suggesting a possible accidental cause of the fire. At 1450. It then says there is evidence that Koch's report had a detrimental impact on the working relationships on the job and analyzes in detail the poor relationship between Koch and O'Sullivan, which it attributes to this report. At 1451–52. And finally, because Koch was not a purely clerical employee and had a policymaking and public contact role, the majority says that the City had a significant interest in regulating his speech. At 1452–53. Weighing these factors together, the majority holds that the City's interest in regulating the speech clearly outweighed Koch's interest in making the speech.

In my view the majority, under the guise of applying the *Pickering* balancing test, usurps the jury's function of determining why Koch was demoted. The linchpin of the City's argument is that Koch deliberately withheld evidence and that county attorney O'Sullivan and, later, Koch's superiors in the city government, were therefore justified in losing confidence in him. From the majority's recitation of the evidence on this issue, one would think that there was no dispute that Koch engaged in this deception. If the evidence were as one-sided as the majority states it, then the majority's *Pickering* analysis might be correct. But this is not an open and shut case. Rather, the majority overlooks those parts of the record that support the jury's verdict. For example, the majority does not mention that O'Sullivan took exception to Koch's conclusions before O'Sullivan ever knew of the omitted laboratory report.[3] Further, reading the majority opinion one has the idea that no evidence supported Koch's conclusion that arson caused the fire, and that he reached this conclusion solely to induce O'Sullivan to bring arson charges against the child victim's parents. But Koch's report indicated that he based his arson conclusion on his assessment that the fire started at four different places in the house simultaneously. *See* II R. Exhibit 1 at 3. The report also explained why Koch discounted all accidental or natural causes. *Id.* at 4.[4] The majority makes much of the fact that Koch changed his mind from a preliminary view that the fire was accidental. The majority, however, ignores Koch's explanation that his apparent change in position resulted from evidence arising during the investigation sufficient

3. Several days before submitting his written report to O'Sullivan, Koch met with O'Sullivan and told him that the fire appeared to be caused by arson. Koch testified that O'Sullivan immediately became "defensive" and emphasized to Koch that arson was difficult to prove. XV R. 1279–80. O'Sullivan admitted that he refused to see Koch or return Koch's calls after reading Koch's report because "I wasn't at all comfortable with [Koch's] decision and I wanted to see the reports of the other fire investigators before I talked to him." XVI R. 1614.

4. At the trial Koch testified in detail about the factors that led him to conclude the fire was arson. *See* XIV R. 1171–91; XV R. 1195–1251. Koch said he did not mention the broken gas valve in his report because he had discounted it

as a possible source of the fire for several reasons. First, the evidence led Koch to conclude that the gas valve was broken as a result of the fire and was not a cause of the fire. The residents of the house did not smell gas leaking as they would have had the gas valve been broken before the fire. XIV R. 1180. Second, there was no ignition source near the place where the gas valve was broken. *Id.* Koch did mention in his report that "[g]as was indeed a fuel after the roof collapsed prior to being shut off by firefighters; line severed when roof fell," II R., Exhibit 1 at 4, but O'Sullivan maintained that Koch's failure to include a laboratory report listing the gas valve as a potential fire source bordered on criminal conduct in falsely reporting a crime. XVI R. 1581–84.

to outweigh his initial presumption that the fire was accidental in origin.[5] In light of this sharp conflict in the evidence, it is most inappropriate for the appellate court to substitute its own judgment of the evidence for that of a jury which observed the witnesses directly.

Koch does not dispute that there was acrimony and divisiveness in the instant case. The questions here are why did it develop and why was Koch demoted? Was Koch demoted because his reasoning was faulty or dishonest, or because O'Sullivan did not want to hear the conclusion Koch was required by his job to make? In the face of the conflicting evidence in the record, this is a fact question that was properly submitted to the jury and then was decided against the City. In my opinion, we must construe the jury's conclusion as one that Koch was demoted because of his expression of belief as to the cause of the fire.[6]

This appellate court has reweighed the evidence and found that the motivating factor in the detrimental employment decision was not Koch's speech. Whether there was substantial evidence to support the verdict is not an issue before us, either in the original panel decision or in the en banc rehearing. I think the speech was clearly on a matter of public concern, and Koch could not be demoted just because he stated his conclusion in a report required of him as employee. The issue before the jury was whether Koch was fired for his conclusion or for some other reason. We have no authority to overturn the jury's

determination on that issue. Therefore, I dissent.

---

5. Koch testified that in investigating this fire he applied the general presumption for fire investigators going into a fire investigation—that "until proven otherwise, it's an accidental fire." XIV R. 1168; *see also* XV R. 1433 ("you don't want to claim arson until you're very sure. That is very detrimental to any investigation"). Also, Koch specifically denied falsifying the report or suppressing any evidence which conflicted with his conclusion that the fire was arson. XV R. 1324, 1342.

6. I would have preferred a more detailed special verdict form than was given here. Ideally, the court should have asked specifically whether

Koch was demoted because of the *content* of his speech in the report. Asking only whether the report was a substantial or motivating factor in the demotion somewhat blurs the line between whether it was Koch's conclusion or how he arrived at the conclusion that made the difference. Nevertheless, the City did not object to the verdict form, and when considered together with the jury's conclusion that Koch would not have been demoted absent the speech, I think we must accept the verdict as a finding that Koch was demoted because the City used his conclusion of arson as an excuse to demote him.