**Glen T. WILSON, Plaintiff-Appellant,**

v.

**CITY OF LITTLETON, COLORADO, a Municipal Corporation, Gail M. Christy, individually and as City Manager of the City of Littleton, Colorado, Marion B. Hobson, individually and as Chief of Police of the City of Littleton, Colorado, Charles E. Robinson, individually and as Captain of Police of the City of Littleton, Colorado, J. Grayson Robinson, individually and as Lieutenant of Police of the City of Littleton, Colorado, and James M. Williamson, individually and as Sergeant of Police of the City of Littleton, Colorado, Defendants-Appellees.**

No. 83–1250.

United States Court of Appeals, Tenth Circuit.

April 16, 1984.

James A. Dodd of Dodd & Seeger, Denver, Colo. (Wayne E. Stockton, Denver, Colo., with him on the brief), for plaintiff-appellant.

Larry W. Berkowitz, Littleton, Colo. (S. Morris Lubow, Denver, Colo., with him on the brief), for defendants-appellees.

Before McWILLIAMS, BREITENSTEIN and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

Glen Wilson, a police officer with the City of Littleton, Colorado, appeals from the district court's judgment denying his claims under the First and Fourteenth Amendments and 42 U.S.C. § 1983 (1976). Wilson was fired as a result of his refusal to obey an order to remove a black shroud from his badge. Wilson wore the shroud to mourn the death of a policewoman from another town. Wilson alleged that the termination was an unlawful infringement of his freedom of speech. We have determined that the district court employed the wrong analysis, but arrived at the correct result. Accordingly, we affirm.

I.

On the morning of June 27, 1981, Wilson learned that an Aurora, Colorado policewoman had died in the line of duty. Although he did not know the woman personally, Wilson placed a black band or shroud across his badge "to express his grief, mourning and sense of loss." Brief of Appellant at 3.

Wilson reported for duty on the night of June 27 with the shroud on his badge.

Sometime during Wilson's shift, his immediate supervisor, Sergeant Williamson, noticed the shroud and ordered Wilson to remove it as it was not part of the official uniform of the Littleton Police Department. Wilson complied with the order at that time. During the next day, Wilson discussed the incident with Lieutenant Walker, the "on-call shift commander" for the previous evening. Walker and Wilson considered a number of options, including wearing the shroud despite the order.[1] Wilson decided upon this course of action.

Wilson reported for duty on the evening of June 28 wearing the shroud, and sought out Sergeant Williamson. The parties met in Williamson's office and discussed the problem. Williamson declined to rescind the order, and Wilson stated that he would wear the shroud despite the order. Williamson told Wilson that he would be suspended if he did so. Nevertheless, Wilson wore the shroud to roll call. Nothing was said then, but following roll call Williamson again ordered Wilson to remove the shroud. When Wilson refused, the Sergeant suspended him.

Chief of Police Hobson called a meeting with Wilson on July 1, 1981. At that meeting, Hobson told Wilson that he had been fired. Hobson gave the following reasons for the termination: insubordination, disrespect of a superior officer, failure to comply with the rules of conduct and verbal orders of a superior officer, violation of a regulation that all lawful orders of a superior officer must be faithfully and promptly obeyed, and violation of a regulation that officers on duty may not wear any nonconforming uniform. Wilson's termination was reaffirmed after a formal grievance proceeding.

Wilson then filed the present action under 42 U.S.C. § 1983, alleging that defendants had deprived him of his rights secured by the First and Fourteenth Amendments. The district court entered judgment for defendants, reasoning that because Wilson's

---

1. The district court found no evidence that Walker himself advocated or encouraged Wil-

son to disobey the direct order of a superior.

First Amendment claim rested on symbolic rather than actual speech, the appropriate analysis derives from *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). The court held that, under the standards established in *O'Brien*, this case involved the lawful regulation of nonspeech conduct that had only an incidental impact on Wilson's speech.

## II.

■ The district court erred in applying *O'Brien* in a public employee context. *O'Brien* imposes on the government a more difficult burden than the Supreme Court has declared is required when the government is acting in its capacity as an employer. *Compare Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968), *with O'Brien*, 391 U.S. at 376–77, 88 S.Ct. at 1678–79. In public employee cases, whether they involve actual or symbolic speech, the proper analysis is that established in *Pickering*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811, and *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). *See, e.g., Leonard v. City of Columbus*, 705 F.2d 1299 (11th Cir.1983); *Key v. Rutherford*, 645 F.2d 880 (10th Cir.1981).

*Pickering* sets out the test for determining whether a public employee's speech or conduct is constitutionally protected.

" '[T]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.' *Keyishian v. Board of Regents*, [385 U.S. 589, 605–06, 87 S.Ct. 675, 684–85, 17 L.Ed.2d 629 (1967) ]. At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. *The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."*

391 U.S. at 568, 88 S.Ct. at 1734 (emphasis added). This circuit has applied the *Pickering* test to review various forms of allegedly unconstitutional discipline against public employees. *See, Childers v. Independent School District No. 1*, 676 F.2d 1338, 1341 (10th Cir.1982); *Key*, 645 F.2d at 884–85; *Schmidt v. Fremont County School District No. 25*, 558 F.2d 982 (10th Cir.1977). In so doing, we specifically have held that a public employee's statements on issues not of general public concern are unprotected by the First Amendment. *Schmidt*, 558 F.2d at 984–85.

Subsequent to the trial in this case, the Supreme Court elaborated on the proper application of the *Pickering* balancing test and on what constitutes a matter of "public concern." *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). *Connick* involved the dismissal of Sheila Myers, an assistant district attorney in New Orleans. Myers learned that she was being transferred to a new section of the criminal court, a transfer which she felt would create a conflict of interest for her. She expressed to several of her supervisors her strong opposition to the transfer, and ultimately met with one of them, Dennis Waldron. Myers and Waldron discussed the transfer along with a number of concerns relating to other office matters. In response to Waldron's suggestion that her concerns were not shared by others in the office, Myers told him that she would do some research on the matter.

That night Myers compiled a questionnaire soliciting her fellow staff members' views on office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns. The following morning, Myers distributed the questionnaire to the other assistant district attorneys in her office. When Waldron learned of this, he phoned Connick, the District

Attorney, and informed him that Myers was creating " 'a mini-insurrection' within the office." 103 S.Ct. at 1687. Connick immediately fired Myers for refusing to accept her transfer and for distributing a questionnaire that was considered an act of insubordination. *Id.*

Myers filed suit under 42 U.S.C. § 1983, claiming that she was wrongfully terminated for exercising her constitutionally-protected right of free speech. The district court agreed, and the court of appeals summarily affirmed. The Supreme Court reversed. In the Court's view, the lower courts had "misapplied" *Pickering.*

> "*Pickering*, its antecedents and progeny, lead us to conclude that *if Myers' questionnaire cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for her discharge.* When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment."

103 S.Ct. at 1689–90 (footnote omitted) (emphasis added). Putting it another way, the Court stated that

> "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."

*Id.* at 1690.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* In *Connick*, the Court held that the question inquiring whether assistant district attorneys "ever feel pressured to work in political campaigns on behalf of office supported candidates," did "touch upon a matter of public concern." *Id.* at 1691. However, the rest of the questions, "pertaining to the confidence and trust that Myers' coworkers possess in various supervisors, the level of office morale, and the need for a grievance committee," did not fall "under the rubric of matters of 'public concern.'" *Id.* at 1690.

The Court distinguished the question regarding political campaigns from the others apparently because it *directly* addressed an important public issue—one that both involves a "fundamental constitutional right" and for which there is "a demonstrated interest in this country." *See id.* at 1691. Therefore, "the issue of whether assistant district attorneys are pressured to work in political campaigns is a matter of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal." *Id.*

However, in rejecting the other questions in Myers' questionnaire as outside the "rubric of matters of 'public concern,'" we do not understand the Court to be saying that the performance of a district attorney's office or of a district attorney as an elected official is not of public concern. *See id.* at 1690–91. Rather, it apparently was the Court's view that the other questions in Myers' questionnaire, while "related to an agency's efficient performance," *id.* at 1691, did not *sufficiently inform the issue* as to be helpful to the public in evaluating the conduct of government. *See id.* at 1699 (Brennan, J., dissenting).

> "[W]e do not believe these questions are of public import in evaluating the performance of the District Attorney as an elected official. Myers did not seek to inform the public that the District Attorney's office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases. Nor did Myers seek to bring to light actual or potential wrongdoing or breach of public trust on the part of Connick and others."

*Connick,* 103 S.Ct. at 1690–91. In order for a public employee's speech to be "of public concern," therefore, it is not always enough that "its *subject matter* could in [certain] circumstances, [be] the topic of a communication to the public that might be of general interest." *Id.* at 1691 n. 8 (emphasis added). What is actually said on that topic must itself be of public concern.

■■■ ˙ With these general guidelines in mind, we turn to the speech in the present case. Neither the trial court nor the parties addressed the issue of the nature of Wilson's speech. On appeal, Wilson merely asserts that the district court should have applied *Pickering* rather than *O'Brien,* and then argues that defendants failed to show a governmental interest in regulating his speech sufficient to satisfy the *Pickering* balancing test. *Connick* makes clear, however, that we do not reach the balancing test unless the government employee first establishes that his speech related to a matter of public concern. That requirement is not met here. The pretrial order in this case states Wilson's claim to be that the "shroud served as a symbolic expression of his grief." Rec., vol. I, at 2. The district court found that "[p]laintiff had strong emotional feelings of grief and solidarity whenever he learned of the death of a police officer. Plaintiff believed that the proper way to mourn the death of an officer was to 'shroud' his badge." *Id.* at 16. While the death of a police officer could conceivably be a topic of general interest to the public under other circumstances,[2] Wilson's personal feeling of grief is not a matter "of public concern" within the meaning of *Connick.*

AFFIRMED.

---

**2.** For example, if a police officer were shot during an ongoing public controversy over the expenditure of public funds to purchase bulletproof vests for the police force, the topic of police officers' deaths clearly would be of general interest. *See generally,* Note, *Rights of Public Employees,* 97 Harv.L.Rev. 164 (1983).