876 F.2d 838
 54 Ed. Law Rep. 159
 Johnny Lee RANKIN, Plaintiff-Appellant,
v.
INDEPENDENT SCHOOL DISTRICT NO. I-3, NOBLE COUNTY, OKLAHOMA,
Bob J. Piguet, individually and in his official capacity as
Superintendent of Independent School District No. I-3, Noble
County, Oklahoma, Donald J. Green, Byron A. Phipps, Kenneth
D. Caswell, each of them, individually and in their official
capacities as Members of the Board of Education of
Independent School District No. I-3, Noble County, Oklahoma,
Donald W. Doyle, Edward Roberson, in their official
capacities only as Members of the Board of Education of
Independent School District No. I-3, Noble County, Oklahoma,
Defendant-Appellees.
 No. 87-1751.
 United States Court of Appeals,
Tenth Circuit.
 June 2, 1989.
 
 Alexander L. Meszaros (James B. Browne, James B. Browne and Associates, Oklahoma City, Okl., with him on the brief), Lexington, Ky., for plaintiff-appellant.
 Stephen Jones (Craig Bryant, Jones, Bryant & Nigh, Enid, Okl., John Gladd and Oliver W. Arbogast of Gibbon, Gladd & Associates, Tulsa, Okl. with them on the brief) of Jones, Bryant & Nigh, Enid, Okl., for defendants-appellees.
 Before McKAY, BARRETT, and SEYMOUR, Circuit Judges.
 SEYMOUR, Circuit Judge.
 
 
 1
 Johnny Lee Rankin brought this action under 42 U.S.C. Sec. 1983 (1982) against Independent School District Number I-3, the District Superintendent, and members of the District school board. Rankin, a tenured teacher employed by the District, alleged that the nonrenewal of his teaching contract violated his First and Fourteenth Amendment rights by punishing him for the exercise of his right to free speech, and by depriving him of his liberty and property interests without due process. The district court granted defendants' motion for summary judgment on the due process claims, concluding that the Oklahoma statute requiring tenured teachers to pay half the cost of a due process hearing is constitutional and that Rankin waived his right to due process by failing to proceed under the statute. After Rankin presented his First Amendment case to the jury, the court granted defendants' motion for a directed verdict, concluding that Rankin had failed to produce any evidence of protected speech. On appeal, Rankin argues that he was denied due process (1) because the state statute imposes an impermissible burden on the due process rights of nonrenewed tenured teachers, and (2) because he was not provided a hearing before the state published stigmatizing reasons for his discharge. He also argues that (3) he presented sufficient evidence of protected speech to withstand a motion for directed verdict. We find merit in two of these contentions and reverse.
 
 I.
 DUE PROCESS
 
 2
 Rankin's right to due process protection in connection with his property and liberty interests is undisputed. As a tenured teacher, he had a constitutionally protected entitlement to his employment. Defendants concede that his nonrenewal on a charge of immorality[1] implicated his liberty interest as well. We address his two due process contentions in turn.[2]
 
 A.
 
 3
 Rankin first argues that he did not waive his right to a due process hearing because the state unconstitutionally burdens that right. Under Oklahoma law, a tenured teacher who is not reemployed is entitled to have a hearing conducted by a hearing panel. See Okla.Stat., tit. 70 Sec. 6-103.4 (1981). The three-member panel consists of a hearing judge selected jointly by the tenured teacher and the school board from a list of state-designated attorneys, id. Sec. 6-103.5, plus one person selected by the teacher and one selected by the board, id. Sec. 6-103.6 C. Both the teacher and the board have the right to have an official transcript of the hearing made. Id. Sec. 6-103.7.6. The statute provides compensation for the hearing panel, and further states: "The local board of education and the tenured teacher shall each be responsible for fifty percent (50%) of the expenses and cost of the hearing and the official transcript, excluding attorney's fees of the parties involved." Id. Sec. 6-103.10 B (emphasis added). The record contains evidence that, in addition to the cost of the transcript, the cost of the hearing includes up to $250 per day compensation for the hearing judge, $50 per day for each of the other panel members, and numerous miscellaneous per diem expenses. See rec., vol. III, at 4. The losing party has the right to appeal the decision to the state district court. See Okla. Stat., tit. 70 Sec. 6-103.12. Rankin asserts that by requiring him to pay for the hearing which the District is required to give him, the cost-sharing statute imposes an impermissible burden on his right to due process.
 
 
 4
 When a state statute penalizes the exercise of a constitutional right, the statute is subject to exacting judicial scrutiny. See, e.g., Meyer v. Grant, --- U.S. ----, 108 S.Ct. 1886, 1891, 100 L.Ed.2d 425 (1988) (strict scrutiny of statute burdening plaintiff's First Amendment rights); Smith v. Paulk, 705 F.2d 1279, 1284 (10th Cir.1983) (strict scrutiny of statute penalizing plaintiff's exercise of constitutional right to interstate travel). Accordingly, the statute at issue here, which imposes a substantial and open-ended financial burden on the right to procedural due process, must be justified by a compelling state interest and must be narrowly tailored so as to impose no greater a burden than necessary.[3] Smith, 705 F.2d at 1284.
 
 
 5
 Defendants have suggested no specific state interest, compelling or otherwise, beyond a general reference to the fairness of requiring Rankin to bear his share of the cost of a hearing. This cost-recoupment argument ignores the fact that it is defendants' affirmative obligation to furnish Rankin a due process hearing when they take action adverse to his liberty or property interests. Defendants have failed to demonstrate any compelling state interest in requiring Rankin to pay an unrestricted amount for that which they are constitutionally required to provide him. The trial judge likewise articulated no state interest upon which the statute could be upheld, basing his decision solely on his unsubstantiated belief that Rankin should have been able to afford the cost on his teacher's salary. See Rec., vol. IV, at 15. Not only is Rankin's actual ability to pay a matter of considerable dispute on the summary judgment record,[4] it is irrelevant to determining whether the state has shown a compelling interest in requiring him to do so.
 
 
 6
 Our conclusion that the statute here cannot withstand strict scrutiny is supported by the decision in Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). The Court held in Boddie that mandatory court fees and costs imposed a significant burden on the ability of those unable to pay to obtain a divorce. The Court further held that in view of the fundamental nature of the right to adjust the marital relationship and the state's monopolization of the means of doing so, a state statute imposing a significant hurdle to that means must be justified by "a countervailing state interest of overriding significance." Id. at 377, 91 S.Ct. at 785. The Court summarily rejected the state's asserted interest in resource allocation or cost recoupment.[5] Id. at 382, 91 S.Ct. at 788.
 
 
 7
 A tenured teacher's right to procedural due process protection of his liberty and property rights in his employment is as constitutionally substantial as the right to divorce. Moreover, the state here has created the need for the process by not renewing Rankin's contract. As in Boddie, the state provides no way to exercise the right other than in a manner penalizing those seeking to assert it.[6] We therefore decline to afford cost recoupment any greater weight here than the Court did in Boddie.
 
 
 8
 We reject defendants' attempt to bring this case within the holdings of Ortwein v. Schwab, 410 U.S. 656, 93 S.Ct. 1172, 35 L.Ed.2d 572 (1973) (per curiam), and Otasco v. United States (In re South), 689 F.2d 162 (10th Cir.1982), cert. denied, 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983), because those cases are readily distinguishable. In Ortwein, the plaintiffs challenged a $25 filing fee required to obtain judicial review of agency decisions reducing their welfare benefits. The Court upheld the fee, pointing out that the right to increased welfare payments has far less constitutional significance than the interest burdened in Boddie, and that the free administrative hearing provided an alternative unburdened means of obtaining due process. See 410 U.S. at 659-60, 93 S.Ct. at 1174-75. Here, to the contrary, Rankin's right to due process is of weightier constitutional significance and the state provides no alternative means to that burdened by substantial cost. In In re South, we upheld a $60 filing fee imposed on creditors who initiate adversary bankruptcy proceedings. In so doing, we relied on "Otasco's ability to pay the fee, the nonfundamental nature of Otasco's interest and the government's legitimate interest in levying the fee." 689 F.2d at 166. Those factors compel a different result here.
 
 
 9
 Unlike the filing fee cases discussed above, the chilling effect of the penalty here is magnified because a tenured teacher's potential liability for costs is unrestricted and is the result in part of factors outside his control. The length of the hearing will depend upon the extent to which a school board offers evidence to support its decision. Moreover, even if a teacher prevails and decides to forego a transcript, the board has the right to request one for an appeal and to require the teacher to pay half the cost. For these reasons, we conclude that the statute challenged here is unconstitutional on its face because it imposes a significant and unjustified open-ended penalty on the exercise of a constitutional right.[7]B.
 
 
 10
 Rankin also contends that due process requires a hearing prior to the publication of stigmatizing charges in connection with an adverse employment decision. We disagree. When the termination of a public employee "is accompanied by public dissemination of the reasons for dismissal, and those reasons would stigmatize the employee's reputation or foreclose future employment opportunities, due process requires that the employee be provided a hearing at which he may test the validity of the proffered grounds for dismissal." Miller v. City of Mission, 705 F.2d 368, 373 (10th Cir.1983). Thus, one's liberty interest is not implicated until the stigmatizing information is published. While the advantages of a prepublication hearing should be obvious to a prudent public employer who wishes to avoid liability for a liberty interest deprivation, a name-clearing hearing may be constitutionally adequate even if it occurs after publication. See, e.g., Codd v. Velger, 429 U.S. 624, 627, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977); Board of Regents v. Roth, 408 U.S. 564, 573 & n. 12, 92 S.Ct. 2701, 2707 & n. 12, 33 L.Ed.2d 548 (1972); Lentsch v. Marshall, 741 F.2d 301, 303-04 (10th Cir.1984). We therefore reject Rankin's argument that procedural due process requires a prepublication hearing.
 
 II.
 FIRST AMENDMENT
 
 11
 Rankin challenges the district court's grant of a directed verdict for defendants on his First Amendment claim. In Saye v. St. Vrain Valley School Dist. RE-IJ, 785 F.2d 862 (10th Cir.1986), we addressed the standard of review applicable to a grant of a directed verdict when a plaintiff claims that an adverse employment decision violates her right to free speech. Although the protected status of the speech at issue is subject to our independent constitutional judgment, the sufficiency of the underlying historical facts upon which the constitutional claim is grounded is determined by the traditional standard of review. Id. at 865. Accordingly, we must view the historical facts most favorably to Rankin, giving him the benefit of all reasonable inferences to be drawn from the evidence. "A directed verdict is appropriate only when the facts and inferences, thus viewed, point so strongly in favor of one party that reasonable minds could not come to a different conclusion." Id.
 
 
 12
 In granting defendants' motion for directed verdict, the district court stated that there was "a total failure of proof in this case as to exactly, or even approximately, what was said, to whom, and under what conditions." Rec., vol. I, doc. 103, at 2-3. Relying on Ewers v. Board of County Comm'rs., 802 F.2d 1242, 1246 (10th Cir.1986), rehearing granted on other grounds, 813 F.2d 1583 (10th Cir.1987), the court concluded that a directed verdict was proper because "the record before the Court does not contain any particular evidence of protected speech." Rec., vol. I, doc. 103, at 3. In so doing the court adopted an overly restrictive standard unwarranted by Ewers and the law upon which Ewers is based.
 
 
 13
 In Ewers, we held that the trial court's submission of the plaintiff's First Amendment claim to the jury was erroneous on two interrelated grounds: the jury had no basis for a verdict when the court's instruction failed to identify the protected speech allegedly motivating the adverse action, and the record itself contained no evidence of any such protected speech. Id. at 1246-47. Our reference in Ewers to the "necessity of presenting precise evidence of the alleged protected conduct, or speech with a degree of specificity," id. at 1246, must therefore be read in the context of a total failure by either the judge or the plaintiff to identify the speech allegedly motivating the defendants' conduct toward the plaintiff.
 
 
 14
 The record in this case stands in clear contrast to the Ewers record. Rankin alleged that the nonrenewal of his contract was in retaliation for his speaking out on the District's method of disciplining its students. He presented evidence that following an incident in which a student was administered corporal punishment, public concern over school disciplinary practices ran high. Indeed, the evidence is undisputed that a school board meeting at which discipline was discussed began at 7:00 p.m. and ran until at least 3:00 a.m. The record contains testimony that Rankin spoke publicly on the issue of school discipline, both with parents and at school board meetings. In addition, there is evidence that Rankin was openly critical of the District for failing to have a written discipline policy and for failing to administer punishment even-handedly.
 
 
 15
 The parties and the district court agreed that the issue of student discipline was a matter of public concern in the District during the relevant period. "There exist few questions within the area of education which are of more interest to the public than the one which raises the possibility of the physical mistreatment of students in the community schools." Bowman v. Pulaski Cty. Special School Dist., 723 F.2d 640, 644 (8th Cir.1983). However, plaintiff must also present evidence that his speech, by its content, form and context, was itself of general interest rather than of purely personal concern. See Saye, 785 F.2d at 866; Wren v. Spurlock, 798 F.2d 1313, 1317-18 & n. 1 (10th Cir.1986), cert. denied, 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 145 (1987); Wilson v. City of Littleton, 732 F.2d 765, 768-69 (10th Cir.1984). Rankin met this burden with evidence that his speech was made publicly to parents and at school board meetings, that the speech occurred at a time of great general interest in the District's discipline policy and in the context of a public debate on the issue, and that the content of his speech contributed to that debate. See Bowman, 723 F.2d at 644-45.
 
 
 16
 The dissenting opinion's quotations and summarizations from the record support the above conclusion. It is not surprising that defendant board members who voted against Rankin "can't recall" whether Rankin spoke out at board meetings on the clearly volatile subject of disciplining school children. As the dissent recognizes, however, Donald Doyle, a board member who voted in favor of Rankin, clearly testified that:
 
 
 17
 "Rankin had attended the board meetings and spoke on the problems of discipline (R., Vol. VII at p. 332); that the spanking of Theresa Johnson and others was a matter of concern in the community, id.; all the board members were concerned about Rankin speaking out on matters of discipline, id. at p. 342; Rankin's appearances at board meetings and statements about discipline were some of the things that irritated Dr. Piguet, id. at 348; Dr. Piguet never actually related that Rankin spoke too much or too often at meetings or any place else, id. at p. 352; the town was factionalized over 'the way stuff was handled at school,' id; and that Rankin was not, to his knowledge, a member of any group or faction, id."
 
 
 18
 Dissent, at 852. In addition, Rankin testified that he spoke publicly about the need for a written, evenly-applied discipline policy, and two parents likewise testified that Rankin came to board meetings and spoke out on discipline, rec., vol. VIII, at 479-83, 513. The dissent inexplicably fails to view this evidence most favorably to Rankin, concluding instead that "there is a total failure of proof in this case as to exactly, or even approximately, what (constitutionally protected speech) was said, to whom, and under what conditions." Dissent, at 852. Yet, the record clearly reflects that the protected speech was Rankin's outspoken articulation of his views on the manner and even-handedness of discipline in the public schools ("what"), and that these views were expressed to parents and to the school board at public meetings ("to whom" and "under what conditions"). It is apparent that the content, form, and context of Rankin's speech was of public, not private, concern, and that Rankin's speech was therefore constitutionally protected.[8]
 
 
 19
 The dissent also claims there was no evidence that Rankin's speech on the subject was a motivating factor in his termination. However, "[t]he trial court's entry of a directed verdict for the District was based upon Rankin's failure to meet his initial burden, that of establishing protected speech." Brief of Appellee, at 28. The trial court's decision did not rest on any failure by Rankin to present evidence that his speech was a motivating factor in his termination, see rec., vol. I, doc. 103, at 3 (order granting defendants' motion for directed verdict), and defendants do not raise this issue on appeal. In any event, the record as quoted by the dissent reflects that Rankin's protected speech was a source of irritation to defendants, evidence which supports a reasonable inference that his speech was a motivating factor in their decision.
 
 
 20
 We conclude that the record here, viewed most favorably to Rankin, adequately identifies the constitutionally protected speech that Rankin claims was a motivating factor in the nonrenewal decision, and thus satisfies the concerns voiced in Ewers. His failure to offer evidence specifying the dates and the exact words of his speech is not therefore fatal to his cause of action. Accordingly, the district court erred in directing a verdict for defendants.[9]
 
 
 21
 The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.
 
 
 22
 BARRETT, Senior Circuit Judge, concurring in part and dissenting in part:
 
 
 23
 I concur in IB of the majority opinion rejecting Rankin's contention that procedural due process required a prepublication hearing.
 
 
 24
 I dissent from the majority's holding that (1) Oklahoma's statutory procedure, i.e., Okla.Stat. Tit. 70 Sec. 6-103.4, et seq., (1981), which provides a tenured teacher a hearing when his teaching contract is, for cause, to be terminated or not renewed is unconstitutional on its face because it imposes a significant and unjustified open-ended penalty on the exercise of a constitutional right, and (2) Rankin did provide evidence of the content, form, and context of his speech sufficient to enable the court to determine whether it was constitutionally protected.
 
 I.
 
 25
 I do not agree with the majority's holding that the Oklahoma statutory procedure, Okla.Stat. Tit. 70 Sec. 6-103.4, et seq., (1981), providing a tenured teacher an independent hearing after the school board has given notice of its intention, for cause, either to terminate or not to renew the teacher's employment contract, is unconstitutional on its face because it assesses one-half of the costs of the proceeding to the teacher.
 
 
 26
 Facial overbreath challenges are "manifestly strong medicine" which must be employed "sparingly and only as a last resort." Broadrick v. Oklahoma, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). When a party asserts such a challenge, the overbreath "must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." Id. at 615, 93 S.Ct. at 2918.
 
 
 27
 The majority states that the defendants have not demonstrated a compelling state interest in requiring Rankin to pay one-half of the hearing costs. This presupposes that Rankin's entitlement to a due process hearing requires that the Board bear all of the costs of the hearing. I am not willing to write that requirement into the Oklahoma statute. If the causes given by the Board for the non-renewal of Rankin's contract should be found to be valid, there is no reason the Board should bear all of the costs of a proceeding requested by Rankin to challenge those causes. It also ignores the fact that Rankin elected not to accept the Board's invitation to meet with the Board to discuss the matters involved in the notice of his contract nonrenewal, notwithstanding the 3 to 2 vote of the Board members, and the fact that the statutory hearing panel of three judges is to be selected independent of the Board. Furthermore, it is uncontested that Rankin did not inform the Board of his inability to pay any portion of the costs of the statutory hearing. The defendants have stated categorically on the record that "[I]f he had, the defendants would have offered to assume the entire cost of the due process hearing." (R., Vol. II, Tab 51, p. 9). It was not until Rankin filed the instant suit that he executed an affidavit stating, inter alia: "7. That he could not and cannot afford the price of the due process rights provided by the statutes of the State of Oklahoma." (R., Vol. I, Tab 25). Such an affidavit is conclusory in nature. It does not contain facts relative to Rankin's financial status. There is nothing in the record on appeal which specifically relates to Rankin's inability to pay one-half of the hearing costs.
 
 
 28
 The majority relies on Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) for its conclusion that the Oklahoma hearing statute cannot stand strict scrutiny and is unconstitutional on its face "because it imposes a significant and unjustified open-ended penalty on the exercise of a constitutional right." I reject this position.
 
 
 29
 The challenges in Boddie were not posited to the statutes on their face, but rather, and significantly, as applied. Thus, unlike the instant case, the Boddie plaintiffs established with concrete evidence that they were indigent and totally unable to pay the requisite costs and filing fees to bring divorce actions in Connecticut state courts. In Boddie, the Court found that the state's interest in allocating scarce resources and balancing the rights of the parties could not override the interest of the indigent plaintiffs in having access to the only route open for dissolving their allegedly untenable marriages. Id. at 381, 91 S.Ct. at 788. Further, the Court stated that "we wish to re-emphasize that we go no further than necessary to dispose of the case before us. A case where the bona fides of both appellants' indigency and desire for divorce are here beyond dispute. We do not decide that access for all individuals to the court is a right that is, in all circumstances, guaranteed by the Due Process Clause of the Fourteenth Amendment so that its exercise may not be placed beyond the reach of any individual, for, as we have already noted, in the case before us this right is the exclusive precondition to the adjustment of a fundamental human relationship." Id. at pp. 382-83, 91 S.Ct. at 788.
 
 
 30
 As previously observed, there is no evidence in our case beyond Rankin's self-serving conclusory statement to demonstrate his inability to pay one-half of the hearing costs. Under these circumstances, this court should refrain from striking down the Oklahoma statute, and particularly so in view of the fact that the identical due process challenge presented here may be decided on state constitutional grounds.
 
 
 31
 Federal courts should refrain from striking down state statutes as unconstitutional where the challenge to the statutes has not been presented to the state courts. Here, certification from this court to the Oklahoma Supreme Court is an available procedure. See, Okla.Stat. Tit. 20 Sec. 1602, et seq. Such procedure would permit the Oklahoma Supreme Court to decide the issue either under the Oklahoma Constitution or the United States Constitution. Sec. 1602, supra, provides, inter alia, that the Oklahoma Supreme Court may answer "questions of law of this state which may be determinative of the cause then pending" where there are no controlling Oklahoma state court decisions. I recognize that abstention is not necessary in a case such as this, but as a matter of comity, federal courts should stay their hands whenever it is feasible to refer the validity of a state statute to the state courts. In the instant case, the relevant facts concerning the due process challenge are not in dispute. This, then, in my view, presents a case whereby this court should decline to exercise it's power in favor of that of the Oklahoma Supreme Court. By exercising such restraint, the Oklahoma Supreme Court would be granted the initial opportunity to examine the Oklahoma statute here challenged and to adjudicate its constitutionality, both under the Oklahoma Constitution and the United States Constitution.
 
 
 32
 In Imel v. United States, 523 F.2d 853 (10th Cir.1975) this court observed that the proposed certification to the Colorado Supreme Court, while requesting an interpretation of doubtful state law, also improperly requested that court to answer a federal law question, i.e., whether the transfer of property arising from a property settlement agreement constitutes a taxable event for purposes of federal income taxation. Unlike the federal law question posed in Imel which was a question exclusively reserved to the federal courts, in the case at bar the federal constitutional challenge based on due process may also be presented and decided in state courts. Furthermore, just as there is no requirement that the state courts answer the questions certified, there is nothing in the law which requires the referral court to accept the answers to the questions certified.
 
 
 33
 The certification procedure would afford the Oklahoma Supreme Court the initial opportunity to judge the constitutionality of the challenged statutes in an important area of state function. It might significantly avoid unnecessary friction in federal-state relations. In Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987), the Supreme Court held in a 42 U.S.C. Sec. 1983 action challenging a Texas state court ordered supersedeas bond under the equal protection and due process clause of the Fourteenth Amendment, that federal court abstention was required in light of the need to avoid a determination of federal constitutional questions if the state courts could resolve the case on state statutory or constitutional grounds. Furthermore, the Court stated that if the matter may not be resolved on state statutory or constitutional grounds, still the state courts are required to resolve federal constitutional questions. The Court observed that the state's interests in the proceeding were so important that abstention was required with regard to the comity between the states and the federal government. The Court emphasized that both the district court and the court of appeals failed to recognize the significant state interests involved, and further that when federal courts interpret state statutes in a way that raises federal constitutional questions, such a reading is not binding on state courts and may be discredited at any time. Finally, the court observed that Article VI of the United States Constitution declares that "the Judges in every state shall be bound" by the Federal Constitution, laws and treaties.
 
 II.
 
 34
 The majority plainly misses the mark in holding, contrary to the district court, that Rankin provided evidence of the content, form, and context of his speech sufficient to enable the court to determine whether it was constitutionally protected. The record tells us otherwise. Furthermore, there is a total failure on the part of Rankin to show that his "protected speech" was the motivating factor in his contract nonrenewal.
 
 
 35
 It was plaintiff Rankin's obligation to establish that certain speech-expressions made by him and communicated to the defendants were constitutionally protected under the First Amendment. I agree with the trial court's finding that "[T]here is a total failure of proof in this case as to exactly, or even approximately, what was said to whom, and under what conditions." The district court correctly observed that jurors must be knowledgeable of the protected speech in order to find that such speech was the motivating factor in the action (nonrenewal of Rankin's teaching contract) being challenged. In my view, the majority has failed to recognize the legal burden imposed on Rankin and has ignored the trial court's precise factual determinations which are solidly supported by the record.
 
 
 36
 The majority opinion does not even pretend to identify any First Amendment speech made by Rankin which could be considered as the "motivating factor" for the Board's decision not to renew his contract, notwithstanding the fact that Rankin was legally charged with the burden of establishing that his constitutionally protected speech was the "motivating factor" in the adverse employment decision. Mt. Healthy City Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); Saye v. St. Vrain Valley School Dist. RE-1J, 785 F.2d 862, 867 (10th Cir.1986). In my view, Rankin utterly failed to carry his burden of proof in his case-in-chief as required under Texas Dep't. of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Thus, I conclude that the district court quite properly granted the defendants' motion for a directed verdict.
 
 
 37
 At the close of the Rankin's case, the Board moved for a directed verdict. Counsel for the Board pointed out that there were two relevant matters which Rankin must have presented sufficient evidence of for the case to go to the jury. First, Rankin must show that he engaged in constitutionally protected speech; second, that the speech was a substantial and motivating factor in the non-renewal of his contract. (R. Vol. IX, p. 571.) Counsel for the Board observed that there were three points upon which Rankin based his argument of protected speech.
 
 
 38
 The first was an incident involving a boy named Henry Grant who apparently suffered from some form of leukemia. Mr. Rankin escorted the boy who started a scuffle with Henry Grant to the principal's office. Grant's parents were not notified of the incident. Counsel for the Board correctly pointed out that the evidence showed only that there was some talk of a lawsuit and that Rankin may have agreed to testify. However, no lawsuit was filed and there is no evidence that the Board members or the school superintendent knew of any involvement Rankin might have in the matter. Furthermore, there is no evidence of any protected speech on Rankin's part involving the matter.
 
 
 39
 The second occasion Rankin relied on was an incident involving Theresa Johnson. She was swatted and Rankin viewed the result of the blow. Apparently, a lawsuit was filed and Rankin indicated that he would be willing to testify, although the record is silent as to what he might testify to. Rankin was never called as a witness, nor was his name included in the witness portion of the pretrial order. The only evidence of any speech by Rankin in connection with that incident is that he spoke privately with Theresa's parents.
 
 
 40
 The third point was that Rankin spoke out generally on subjects relating to discipline at school board meetings. The evidence in that regard is very sketchy and vague. One witness, Mrs. Grant, did testify that she was at a school board meeting when Rankin spoke out against putting a boy out of school because of a disciplinary problem.
 
 
 41
 The trial judge pointed out that, in light of Mrs. Grant's testimony, there was not a total absence of evidence as to what Rankin stated at a board meeting. Counsel for the defendants argued, however, if that was the case, there was no evidence that Rankin's protected speech, if there was any, was a substantial and motivating factor in the Board's nonrenewal action.
 
 
 42
 The court, out of concern for the absence of evidence, inquired of Rankin's attorney what, specifically, was the protected speech he relied upon and what evidence there may be that the speech was the motivating factor for the Board's action. The responses were completely unsatisfactory and identified no specific evidence.
 
 
 43
 In granting the defendants' motion for a directed verdict, the court cited a passage from Ewers v. Board of County Comm'rs, 802 F.2d 1242 (10th Cir.1986) (consolidated cases No. 84-2437 and No. 84-2477), reh'g granted on other grounds (No. 84-2437), 813 F.2d 1583 (10th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 704, 98 L.Ed.2d 655 (1988), which he believed to be particularly apposite. "The necessity of precise evidence of the alleged protected conduct or speech with a degree of specificity in a damage [suit] such as this is obvious: Jurors must be knowledgeable of the protected conduct or speech in order to find that the conduct was a motivating factor in the action being challenged." (R., Vol. IX, p. 598). The court found no evidence sufficient to go to the jury on the content, form and context of the protected speech as required by Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The court noted that the record indicates a reasonable suspicion that Rankin may have been non-renewed for reasons other than those stated, but that it's "wholly speculative as to what those other reasons may be, personality conflict, a sense he wasn't part of the team, a generalized feeling of an uncooperative stance by Plaintiff as against the School Board or a sense that he simply was not as adequate a teacher as the School Board was willing to retain, notwithstanding his tenured status." (R., Vol. IX, p. 549). The court, having reviewed the evidence in the light most favorable to Rankin, found that there was no evidence of the content, form and context of any protected speech. Neither could the court find any evidence that any speech by Rankin was a motivating factor in the Board's non-renewal of his contract. I agree.
 
 
 44
 After reviewing the entire record with the district court's comments in mind, I conclude that there is no evidence of constitutionally protected speech which Rankin could rely upon in regard to the Board's decision not to renew his contract:
 
 RANKIN--DIRECT TESTIMONY:
 
 45
 Q. Did you actually attend Board meetings and discuss discipline?
 
 
 46
 A. Yes, several times.
 
 
 47
 Q. Now, tell us, just tell the Jury what you would say at Board Meetings, what the problems were and what positions you took.
 
 
 48
 A. Well, it depended--it would depend upon what was being discussed at the time. The policy--it was just like they were going to pass the policy that whoever was the sponsor of an activity was required to make sure all students that were at the activity stay within the guidelines of the school district. That would mean, like if I went to a stock show, then I would be required to go out on the midway to make sure students from the school were not smoking or chewing tobacco or doing anything against school policy. And I stated at that time that I didn't have time to be a policeman and run around outside when I had my job to take care of the animals and prepare the students, make sure they got to the show ring on time and made sure their animals were fit to be shown.
 
 
 49
 (R., Vol. V, p. 20).
 
 RANKIN--CROSS EXAMINATION:
 
 50
 Q. I see. Now, Mr. Rankin, you say that you attended a number of Board Meetings in which you discussed present at the Board, discipline policy, is that correct?
 
 
 51
 A. Yes.
 
 
 52
 Q. And you think that because you spoke out at those Board Meetings that that was a factor in their terminating you.
 
 
 53
 A. Yes.
 
 
 54
 Q. And what facts do you base that on?
 
 
 55
 A. On the opinion that I was a local citizen, that I would question purchases that were made of why they wanted to buy any type of equipment for the school, that I didn't feel like the school didn't have no need for an infrared security system, that's one of the purchases they wanted to spend $85,000 on a security system, why does the school need an infrared security system.
 
 
 56
 Q. Mr. Rankin, where in your lawsuit do you claim that you were fired because you opposed an $85,000 infrared security system.
 
 
 57
 A. There was none.
 
 
 58
 Q. I understand the basing of your claim is that you were fired because you criticized at the public meeting the Board's disciplinary policy as it related to students.
 
 
 59
 A. Yes.
 
 
 60
 Q. I asked you what information or facts you had, you answered the question by stating your opinion. Is that what you're basing it, on your opinion?
 
 
 61
 A. I was vocal at Board meetings and I felt like they resented the fact that I would question their decisions.
 
 
 62
 Q. And that's your opinion?
 
 
 63
 A. That's my opinion, yes.
 
 
 64
 (Id., p. 59-60)
 
 
 65
 * * *
 
 
 66
 * * *
 
 
 67
 Q. My question to you, sir: If in the three previous years some or all of these Board Members had voted with you and against Doctor Piguet, what caused them to change their mind in March of 84?
 
 
 68
 A. Well, the situations were different.
 
 
 69
 Q. I see.
 
 
 70
 A. I had become more vocal.
 
 
 71
 Q. Because you were coming to the Board Meetings?
 
 
 72
 A. Because I was present at the Board Meetings and because I was questioning some of the policies they were making, if they were really legitimate reasons.
 
 
 73
 (Id., p. 77)
 
 
 74
 DOYLE (member of the School Board who voted to renew Rankin's employment contract)--CROSS EXAMINATION:
 
 
 75
 Q. In the executive session meeting was there comments from any of the Board Members or the Superintendent or the Principal with respect to Mr. Rankin's conduct or his appearances or his speaking out on matters of interest to the operation of the school?
 
 
 76
 THE COURT: Let's just add to that, matters of interest concerning discipline of children in the school.
 
 
 77
 A. I don't remember as a specific answer or question in the session directly about John Rankin due to the discipline matters, it was common knowledge; and part of these allegations, in my opinion, come through this.
 
 
 78
 (R., Vol. VIII, p. 393)
 
 
 79
 * * *
 
 
 80
 * * *
 
 DOYLE--CROSS EXAMINATION:
 
 81
 Q. Now, you say Mr. Rankin attended meetings and spoke on the discipline matters?
 
 
 82
 A. Yes. As I recall, we had three or four meetings that discipline was a pretty good issue in.
 
 
 83
 * * *
 
 
 84
 * * *
 
 
 85
 Q. All right. What did he say at the first meeting?
 
 
 86
 A. I don't remember the specific, other than people expressed concerns and--
 
 
 87
 Q. How many people expressed concern at the first meeting that he spoke?
 
 
 88
 A. I would think there was several.
 
 
 89
 Q. How long did he speak?
 
 
 90
 A. Nobody spoke too awful long as an individual.
 
 
 91
 Q. Can you remember anything he said?
 
 
 92
 A. I can remember some words.
 
 
 93
 Q. What did he say?
 
 
 94
 A. I say I can remember some words, no words as such but more of the emotion.
 
 
 95
 (Id., p. 424-25)
 
 
 96
 * * *
 
 
 97
 * * *
 
 
 98
 Q. My question is what do you recall he said, not what other people said but what Mr. Rankin said at the second meeting.
 
 
 99
 A. As individual words, I don't remember; it involves two subjects, spanking--
 
 
 100
 Q. Do you remember he spoke on those two subjects or are you just recalling generally that's what other people talked about?
 
 
 101
 A. That's the only two subjects that was talked about as discipline.
 
 
 102
 Q. Do you have a memory of Mr. Rankin speaking on those two subjects?A. I believe I do.
 
 
 103
 Q. What do you believe your memory tells you?
 
 
 104
 A. It involved a--or two problems, double standards and corporal punishment.
 
 
 105
 Q. All right. What did Mr. Rankin say on double standards?
 
 
 106
 A. Just the punishment involved whose child it was.
 
 
 107
 Q. Well, did he give any examples?
 
 
 108
 A. I don't remember.
 
 
 109
 Q. And on corporal punishment what did he say?
 
 
 110
 A. This I can't really remember, I think one overlaps the other one.
 
 
 111
 Q. At the third meeting, do you recall when that was that he spoke?
 
 
 112
 A. Do I remember him a-speaking at the meeting?
 
 
 113
 Q. At a third meeting, yes, sir.
 
 
 114
 A. I remember him speaking at a meeting, whether it was a third meeting I don't know.
 
 
 115
 Q. While Mr. Rankin was speaking at any of these meetings, did Donnie Green do anything in your presence that indicated that he was aggravated that Mr. Rankin was speaking?
 
 
 116
 A. Nothing verbally.
 
 
 117
 Q. Well, other than verbally what did he do?
 
 
 118
 A. I don't know whether uneasiness--
 
 
 119
 A. How was that expressed, Mr. Doyle?
 
 
 120
 A. I don't know, maybe the way a person sets or shifts or looks or as anybody uneasy may do.
 
 
 121
 Q. Can you be more specific than that?
 
 
 122
 A. Not really.
 
 
 123
 Q. How about Mr. Phipps, did he say or do anything that you could see or hear that would indicate that he was upset at any of these meetings that Mr. Rankin was speaking?
 
 
 124
 A. No.
 
 
 125
 Q. And, Mr. Caswell, did you see him or hear him do anything at these meetings while Mr. Rankin was speaking?
 
 
 126
 A. He wasn't on the Board.
 
 
 127
 Q. All right. How about Doctor Piguet, did you see him do anything or hear him say anything at the meeting that indicated he was upset with Mr. Rankin speaking at the meetings?
 
 
 128
 A. I believe the expression on his face and the way he would move, you could tell he was annoyed.
 
 
 129
 Q. You could tell he was annoyed.
 
 
 130
 A. Uh-huh.
 
 
 131
 Q. Okay. How could you tell that?
 
 
 132
 A. As you would tell if anybody was annoyed.
 
 
 133
 Q. Well, how did you know he was annoyed at Mr. Rankin?
 
 
 134
 A. They were talking.
 
 
 135
 Q. Who was talking?
 
 
 136
 A. I suppose when this discipline deal was going on.
 
 
 137
 Q. You mean Doctor Piguet and Mr. Rankin were talking?
 
 
 138
 A. They usually didn't talk directly to one another, somebody got up and said whatever they said.
 
 
 139
 Q. Well, I thought you said that with Doctor Piguet it was the expression on his face, not what he was saying.
 
 
 140
 A. Uh-huh.
 
 
 141
 Q. What was the expression on his face that made you think he was annoyed at Mr. Rankin?
 
 
 142
 A. Just an expression of annoyance.
 
 
 143
 (R., Vol. VIII, p. 427-30)
 
 
 144
 LAFOE (parent who attended board meetings)--DIRECT EXAMINATION:
 
 
 145
 Q. All right. You indicated you attended most of the Board Meetings. Did Mr. Rankin attend the Board Meetings?
 
 
 146
 A. I don't know that he attended all of them, but, yes, I seen him there.
 
 
 147
 Q. And at the Board Meetings would he speak out?
 
 
 148
 A. Yes, sir.
 
 
 149
 Q. Now, do you know whether or not John Rankin openly spoke out on issues involving discipline during that period of time?
 
 
 150
 A. You mean at the Board Meetings?
 
 
 151
 Q. At the Board Meetings or individually to parents.
 
 
 152
 A. Yes, I mean a lot--a lot of people discussed it and I know he had discussed it, yes.
 
 
 153
 Q. Do you know of anyone you observed him being critical of at the Board Meetings or anywhere else?
 
 
 154
 A. I couldn't say right off, it's been two years ago.
 
 
 155
 (Id., p. 479-80)
 
 
 156
 MRS. GRANT (Parent who attended School Board meeting)--CROSS EXAMINATION:
 
 
 157
 Q. Have you ever been at any Board Meetings where Mr. Rankin spoke out on issues of discipline or occurrences in the school?
 
 
 158
 A. Mr. Rankin--yes, I would say that Mr. Rankin, yes.
 
 
 159
 Q. Can you recall any specifics about what he might--subject matter or whatever he was talking about?
 
 
 160
 A. It's been so long ago, I think there was I think one of the times he was trying to help the Fink boy because they just wanted to totally put him out of school.
 
 
 161
 Q. Okay. How would he try to help the Fink boy, for example?
 
 
 162
 A. Well, there would be a time when people could speak and Mr. Rankin might, you know, stand up and, you know, say, couldn't we do this, or isn't there some way we could do that, or something like that order.
 
 
 163
 (Id., p. 513)
 
 
 164
 During trial, Rankin called each of the five board members serving at the time that his contract was not renewed:
 
 
 165
 Kenneth Coswell, who voted not to renew Rankin's contract, testified, inter alia, that: he had attended several meetings prior to his election to the board and there was never, to his knowledge, any discussion by board members that people should not be so vocal about disciplinary matters within the schools (R., Vol. VII, p. 213); while on the board he never observed any board member or the superintendent, Dr. Bob Piguet, ever try to silence someone or try to keep someone from speaking their piece at a board meeting (Id., p. 217); teachers frequently addressed board meetings and everyone had a chance to voice their opinions, id., at 218; he did not remember Rankin ever addressing the board, id. at p. 220; he did not remember Rankin speaking to the board about student discipline, id.; he did not vote to terminate Rankin because he was allegedly speaking out on student discipline, id.; and that the main reason Rankin was fired was his failure to do his duty, his willful neglect, id. at p. 226.
 
 
 166
 Byron Phipps, who voted not to renew Rankin's contract testified, inter alia, that: Rankin had had a "cuss fight" with a teacher, an act for which he could not forgive Rankin (R., Vol. VIII at p. 277); he did not remember that anybody was "just out to see" that Rankin lost his job, id. at p. 282; he did not believe that people tried to justify Rankin's termination after the fact, id.; he did not remember Rankin speaking to the board about Theresa Johnson's paddling, id.; he did not recall Rankin speaking to the board at the January, 1985, meeting, id. at p. 285; he did not recall the board discussing during their January, 1985, executive committee meeting any comments that Rankin might have made relative to discipline problems at the school, id. at p. 285; Rankin's performance, both good and bad, was discussed during the March 4, 1985 meeting, id., p. 288; and that he did not make a private investigation of the eight or nine reasons given by Dr. Piguet for not retaining Rankin. Id. p. 290.
 
 
 167
 Donald Green, a board member who voted not to renew Rankin's contract testified, inter alia: he did not remember Rankin attending board meetings and speaking out on discipline (R., Vol. VII at p. 315); it was possible that Rankin could have attended meetings which he did not remember, id.; discipline within the district was a subject of concern for parents during January, 1985, but he did not recall Rankin speaking about discipline during the January, 1985, board meeting, id. at p. 317; and that he knew of no instance where Dr. Piguet told patrons who were trying to speak about discipline to sit down and be quiet and not talk, id.
 
 
 168
 Donald Doyle, a board member who voted to renew Rankin's contract testified, inter alia: Rankin had attended the board meetings and spoke on the problems of discipline (R., Vol. VII at p. 332); that the spanking of Theresa Johnson and others was a matter of concern in the community, id.; all the board members were concerned about Rankin speaking out on matters of discipline, id. at p. 342; Rankin's appearances at board meetings and statements about discipline were some of the things that irritated Dr. Piguet, id. at 348; Dr. Piguet never actually related that Rankin spoke too much or too often at meetings or any place else, id. at p. 352; the town was factionalized over "the way stuff was handled at school," id; and that Rankin was not, to his knowledge, a member of any group or faction, id.
 
 
 169
 Edward Roberson, a board member who voted to renew Rankin's contract, testified, inter alia: he did not believe that the board had any formal or informal custom or policies during September, 1985--March, 1985 regarding the treatment of dissenters or people who disagreed with the actions of the board or administrators (R., Vol. VIII at p. 526); the board did discuss limiting how long a person could speak in view of the number of people attending the board meetings, id. at p. 527; parents who attended the board meetings were allowed to speak even when they were not on the agenda, id. at p. 528; and that anyone who wanted to speak to the board whether parent, teacher, contractor or member of the public, was allowed to do so, id. at pp. 529-30.
 
 
 170
 Patricia Jaynes, a teacher at the same school where Rankin was employed testified, inter alia: she was involved in an incident with Rankin during which he used a profanity (R., Vol. VII at p. 304); the incident was settled later during the same day and there were no hard feelings between them, id. at p. 305; she had seen Rankin at board meetings, id. at p. 307; she did not recall Rankin ever criticizing Dr. Piguet or any board members during a board meeting; she didn't recall Rankin ever standing up and criticizing any board policy at any board meeting; and that she didn't recall Rankin criticizing any teacher at any board meeting.
 
 
 171
 Thus, my detailed review of the record shows that the district court was correct in finding that there is a total failure of proof in this case as to exactly, or even approximately, what (constitutionally protected speech) was said, to whom, and under what conditions or that the speech was a motivating factor in the Board's decision not to renew Rankin's employment contract. I would affirm the district court's grant of the defendants' motion for a directed verdict.
 
 
 
 [1]
 The immorality charge stems from an incident in the teachers lounge during which Rankin, in a heated argument with another teacher, swore either at the teacher or at a piece of office equipment
 
 
 [2]
 We are not here concerned with the nature of the process due Rankin. Lassiter v. Dept. of Social Serv., 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), cited by defendants, thus sheds no light on our inquiry. That case considered the requirements of due process under the circumstances, not whether the due process right itself was improperly burdened
 
 
 [3]
 The dissent starts off on the wrong foot by assuming the majority opinion is employing an overbreadth analysis. We do not do so. The overbreadth doctrine is inapplicable here. This doctrine has been "carved out in the area of the First Amendment." Broadrick v. Oklahoma, 413 U.S. 601, 611, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973). In order to give the First Amendment "breathing space," id., the Supreme Court "has altered its traditional rules of standing to permit--in the First Amendment area--'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.' " Id. (quoting Dombrowski v. Pfister, 380 U.S. 479, 486, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965)). In the instant case, Rankin has not challenged the Oklahoma statute under the First Amendment. Nor has he alleged that while his own conduct is subject to regulation, the statute could conceivably be applied unconstitutionally to others. He contends that the statute on its face impermissibly burdens his own constitutional right to procedural due process. As set forth in the text supra, we have followed the precedent of both the Supreme Court and this circuit in applying strict judicial scrutiny to this claim to determine whether the statute is facially invalid
 
 
 [4]
 In opposition to the motion for summary judgment, Rankin filed an affidavit stating that he could not afford the costs of the due process hearing. Rec., vol. I, doc. 25 at 3-4. Rankin had recently taken bankruptcy, and he had lost a child custody fight for which he owed attorneys fees. Rec., vol. IV, at 13-14. His attorney had advised him that a two or three-day hearing would cost him a thousand or fifteen hundred dollars. Id. at 14. Defendants argue that Rankin should have requested that the costs of the hearing be waived, if he could not afford to pay. Given the mandatory language of the statute (the parties "shall each be responsible for fifty percent (50%) of the expense"), we decline to hold Rankin responsible for failing to request a waiver
 
 
 [5]
 The dissent is correct in pointing out that the Court in Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), held the statute there invalid as applied, while the statute here is challenged as invalid on its face. However, that distinction is irrelevant to our citation to Boddie. The strict scrutiny test contains the same requirement when applied to either type of claim: the state must demonstrate a compelling state interest. See, e.g., Boddie, 401 U.S. at 377, 91 S.Ct. at 785 (state interest must be of "overriding significance"); Smith v. Paulk, 705 F.2d 1279, 1284 (10th Cir.1983) (statute must be justified by "compelling state interest"). Thus, the point we found significant in Boddie, that cost recoupment is not a compelling state interest, is not affected by the fact that Boddie involved a challenge to a statute as applied
 
 
 [6]
 In Winston v. City of New York, 759 F.2d 242 (2d Cir.1985), the court considered facts more closely analogous to those before us. There, teachers facing charges giving cause for dismissal could either resign or challenge the charges in a hearing. Teachers who resigned while under charges received pension benefits, while those dismissed for cause did not. A teacher's exercise of the constitutional right to a hearing was thus chilled by the prospect that an adverse decision would result in the loss of pension benefits. The court balanced "the need for the challenged statute against its chilling effect on the exercise of the parties constitutional rights", id. at 246, and held that the automatic penalty "places an unconstitutional burden on a teacher's right to a hearing," id. at 245. Although the court employed a slightly different analysis than we do here, it reached the same result
 
 
 [7]
 The dissent's suggestion that we certify the due process question to the Oklahoma Supreme Court is manifestly inappropriate. Under our Tenth Circuit Rule 27.1, this court may certify to the state court "questions arising under the laws of that state which may control the outcome of a case pending in the federal court." The dissent suggests that certification would allow the Oklahoma Supreme Court to decide the due process issue "either under the Oklahoma Constitution or the United States Constitution." Dissent, at 845. That the validity of the statute under the federal constitution is a question of federal rather than state law is too obvious to require discussion. The validity of the statute under the state constitution, while undoubtedly a question of state law, is not a question in this case because Rankin has not challenged the statute as violative of the state constitution
 
 
 [8]
 In determining whether a public employee's speech on a matter of public concern is constitutionally protected, a court must balance the employee's interest in exercising his First Amendment rights and the employer's interest in efficient government services. See Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); Bowman v. Pulaski Cty. Special School Dist., 723 F.2d 640, 644-45 (8th Cir.1983). That balancing test is not at issue here. Defendants do not argue that the decision not to renew Rankin's contract was based on a conclusion that his speech was too disruptive; rather, defendants argue that Rankin's speech played no part in their decision. See Saye v. St. Vrain Valley School Dist., 785 F.2d 862, 867 (10th Cir.1986)
 
 
 [9]
 Rankin also contends that the trial court erred in excluding evidence offered under Fed.R.Evid. 404(b) relevant to the First Amendment claim. In view of our holding that this case must be retried, and the possibility that this issue may not arise again in the same context, we decline to assess the merits of this claim